**BURLINGTON NORTHERN RAILROAD COMPANY,**
Plaintiff–Appellant,

v.

**CITY OF SUPERIOR, WISCONSIN,**
Defendant–Appellee.

No. 90-3086.

United States Court of Appeals,
Seventh Circuit.

Argued April 1, 1991.

Decided May 20, 1991.

Carol Skornicka, Michael, Best & Friedrich, Madison, Wis., Ellen M. Pokrass, Michael, Best & Friedrich, Milwaukee, Wis., James W. McBride, Anne M. Stolee, Laughlin, Halle, McBride, Lunsford & Fletcher, Washington, D.C., for plaintiff–appellant.

Bonnie A. Wendorff, Jon C. Nordenberg, James F. Lorimer, Boardman, Suhr, Curry & Field, Madison, Wis., for defendant-appellee.

Before POSNER, FLAUM and KANNE, Circuit Judges.

POSNER, Circuit Judge.

Captioned "Tax Discrimination Against Rail Transportation Property," section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 11503, forbids states or their subdivisions to assess such property at a higher fraction of fair market value than they assess other commercial and industrial property; to levy or collect a tax based on such an assessment; to tax rail transportation property at a higher rate than other commercial and industrial property; or—the specific provision involved in this case—to "impose an-

other tax that discriminates against a rail carrier." §§ 11503(b)(1)–(b)(4). Railroads have long been attractive targets for state and local taxing authorities: so many railroad assets are at once specialized to railroading and physically immobile that it is very difficult for railroads to escape heavy taxation by transferring the assets to another industry or location; in other words, the "exit" option for limiting political exploitation is denied them. By the 1960s the railroads were in permanent decline. Section 306 was an effort to lift from their backs some of the heavy hand of state and local taxation. *Clinchfield R.R. v. Lynch,* 700 F.2d 126, 128 and n. 1 (4th Cir.1983); *Ogilvie v. State Board of Equalization,* 657 F.2d 204, 206–08 (8th Cir.1981).

In 1977 Wisconsin enacted a statute that empowers its municipalities to levy an occupational tax on the owners and operators of "iron ore concentrates docks" at the rate of 5 cents per ton handled. Wis.Stats. § 70.40. There are only three such docks in the State of Wisconsin, all in the city of Superior, all operated by the Burlington Northern Railroad, which owns two of the docks and leases the third. The docks—actually wharves—jut out into Lake Superior. Trains of the Burlington Northern carry the iron ore concentrates onto or near the wharves, from which the concentrates are loaded into barges. There is a fourth wharf in the city, for loading coal from trains into barges. It is not owned or operated by a railroad, and is of course not subject to the tax on iron ore concentrates docks which Superior has imposed consistent with the enabling statute; but the operator of the coal dock is subject to a separate operating tax, which happens also to be at the rate of 5 cents per ton. Wis. Stats. § 70.42. Burlington Northern is liable for the tax on the iron ore concentrates docks, which amounts to some $600,000 a year. It brought this suit to enjoin the tax. The district judge granted summary judgment for the city on the ground that the railroad had failed to show that there was a genuine issue of material fact.

■ The tax is not a property tax and the railroad isn't complaining about an assessment. We are therefore in subsection (b)(4) ("another tax that discriminates against a rail carrier"). The railroad's position is that a tax on an activity that is engaged in exclusively by a railroad in the course of its railroad business is discriminatory per se, and since the tax in this case is of that character no other evidence was required to prove a violation of the federal statute. The city responds that since another entity could operate the iron ore concentrates docks—for consider the coal dock—those docks are not an integral part of Burlington's railroad business; or at least that the railroad has failed to prove that they are. The response is wide of the mark. Who conducts the activity that is taxed is irrelevant. The tax will increase the cost of the activity, to the railroad's detriment. The statute applies to taxes on rail transportation property and to other taxes if they discriminate against rail carriers; it thus is not limited to cases in which the railroad is the taxpayer. *Trailer Train Co. v. State Board of Equalization,* 710 F.2d 468, 471 (8th Cir.1983).

■ But we have still to evaluate the per se rule that the railroad argues for. The federal statute is aimed primarily at property taxes and as to them it sets forth clear standards designed to prevent the placing of an excess burden on railroads. Subsection (b)(4) is a catch-all designed to prevent the state from accomplishing the forbidden end of discriminating against railroads by substituting another type of tax. It could be an income tax, a gross-receipts tax, a use tax, an occupation tax as in this case—whatever. It is true that the House committee report described subsection (b)(4) as forbidding the "so-called 'in-lieu' tax," H.R. Rep. No. 725, 94th Cong., 1st Sess. 77 (1975); see also *id.* at 113, the reference being to gross receipts taxes that a few of the states impose in lieu of property taxes. Dennis L. Thompson, *Taxation of American Railroads: A Policy Analysis* 70 (1981). The Senate report, however, appears to reject this characterization. S.Rep. No. 595, 94th Cong., 2d Sess. 166 (1976), U.S.Code Cong. & Admin.News 1976, 14, 148, 180–181. And rightly so: to confine subsection (b)(4) to gross receipts

taxes would merely invite states to find another type of tax to impose in lieu of property taxes, and the statute would have accomplished very little. Like the other courts to have addressed the question, we reject the limiting interpretation. *Richmond, Fredericksburg & Potomac R.R. v. Department of Taxation,* 762 F.2d 375, 378–80 (4th Cir.1985), and cases cited there; *Kansas City Southern Ry. v. McNamara,* 817 F.2d 368, 371–74 (5th Cir.1987); *Trailer Train Co. v. Leuenberger,* 885 F.2d 415, 416–17 (8th Cir.1988). We add that the second reference to subsection (b)(4) in the House Report describes the target as "the imposition of a discriminatory 'in lieu tax,'" H.R.Rep. No. 725, *supra,* at 113—a phrasing that seems to use "in lieu" as a generic term, rather than as a specific form of tax (a tax on gross receipts).

■ The preceding subsections of the statute, perhaps to facilitate administration of the statute, forbid states to tax railroad property proportionately more heavily than other commercial and industrial property, even if the railroad derives a greater benefit from the public services defrayed by the tax. By analogy, we may assume that a tax is "discriminatory" within the meaning of the fourth subsection if it imposes a proportionately heavier tax on railroading than on other activities, even if the taxing authority might be able to show that the activity imposes a disproportionate burden on public services. Cf. *Trailer Train Co. v. State Tax Comm'n,* 929 F.2d 1300, 1303 (8th Cir.1991). A tax that, as in this case, is imposed on an activity in which only a railroad or railroads engage—such as placing iron ore concentrates on wharves—is prima facie discriminatory under the suggested test. It could be a tax on operating rail crossing signals, on selling railroad passenger tickets, on loading tank cars, on hoisting containers from flat cars onto flatbed trucks—or on placing iron ore concentrates shipped by rail on wharves for further shipment, a form of unloading.

Should the taxing authority be allowed to rebut the prima facie case of discrimination by showing that taxes on equivalent services eliminate any discrimination against rail carriers? Maybe the tax is on railroad boxcars (cf. *Trailer Train Co. v. State Tax Comm'n, supra*) but the taxing authority presents evidence that there is an equal tax on truck trailers. Would the burden then shift back to the railroad to produce evidence that the apparent neutrality of the tax system considered as a whole is spurious? If so, this case may have a long life. Coal, iron ore concentrates, and other goods shipped by rail are not the only goods that are loaded onto ships docked at the city of Superior. We do not know how the operators of the wharves on which those goods are placed for loading are taxed. Maybe like the operator of the coal dock they pay 5 cents a ton. That would make it like our railroad boxcar and truck trailer case, and under the approach we are considering the burden would shift back to the railroad to show that, perhaps because iron ore concentrates are much heavier than other things shipped by boat, the tax system, considered as a whole, burdens railroads disproportionately.

Since the railroad made in our view a prima facie case simply by proving that the tax was imposed on an activity (the operation of iron ore concentrates docks) in which only a railroad engages, the district judge erred in granting summary judgment for the city. The harder question is whether the case should go back to the district court for a trial at which the city, as in *Atchison, Topeka & Santa Fe Ry. v. Bair,* 338 N.W.2d 338 (Ia.1983), would be entitled to present evidence that the tax on the railroad's wharves is not discriminatory when other taxes on comparable services are factored into the analysis, or, as the railroad argues, whether rebuttal should be precluded and the tax deemed discriminatory per se.

The Fifth Circuit's powerful opinion in *McNamara* recommends the second course; see also *Trailer Train Co. v. State Tax Comm'n, supra,* at 1302. The court thought it unrealistic to suppose that the overall burden of a state's tax system could be rationally evaluated by the methods of litigation—unrealistic to think a court could figure out whether different taxes on other activities might offset the burden on the

railroad industry of a tax limited to railroads. It is true that the Supreme Court sometimes attempts that type of ambitious inquiry in cases in which state taxes are challenged under the commerce or equal protection clauses of the Constitution. For recent examples see *Tyler Pipe Industries, Inc. v. Washington Dept. of Revenue,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987); *American Trucking Ass'ns, Inc. v. Scheiner,* 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987); *Goldberg v. Sweet,* 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). But in those areas the Court is operating without the benefit of a congressional policy directive. Reading subsection (b)(4) of our statute in light of the approach taken in the first three subsections, we infer a congressional desire that courts avoid the thicket of incidence analysis and forbid states to single out railroads for taxation, as was done here by levying a tax on an activity in which, in Wisconsin anyway, only railroads engage. The state is confined to taxing railroads as members of larger taxpayer groups—owners of commercial or industrial property, recipients of gross income, recipients of net income, whatever. It cannot levy a tax on inputs into railroading alone.

To all legal generalizations (well, almost all) there are exceptions. We can imagine a case in which a railroad so dominated the economy of a jurisdiction that a tax general in form—a property tax on commercial and industrial property—was in fact a tax on railroads alone, because railroads were the only owners of such property in the jurisdiction. Or suppose Superior levied a tax on theater receipts, and the Burlington Northern then bought the only theater in town. In either case, the application of the standard of *McNamara* would produce a tax exemption for railroads, which was not the intention behind section 306(d). We can deal with such cases when and if they arise. For today it is enough to hold that a state cannot be allowed to place staggering burdens of inquiry on the judicial system by picking out a narrow class of activities that just happen to be engaged in solely by railroads, or a narrow set of inputs (boxcars, for example) that just happen to be used only in railroading; taxing that class; and asking the court to consider whether the state's tax system as a whole avoids burdening the railroad industry disproportionately.

Another difficult question that we need not decide today is how the judicial inquiry should be structured if the tax is imposed on an activity in which railroads are not the sole, but are the principal, actors. Suppose a tax of 5 cents per ton handled by all docks in the State of Wisconsin is levied, and railroads handle 85 percent of all the cargo handled by docks in Wisconsin. *Trailer Train Co. v. Leuenberger, supra,* 885 F.2d at 418, holds, sensibly in our view, that the inclusion of some nonrail activities in a class of activities dominated by railroads does not immunize a tax from challenge under section 306. But what sort of proof the railroad must present and what rebuttals or defenses are available to the taxing authority are questions for another day.

REVERSED.

FLAUM, Circuit Judge, dissenting in part.

Wisconsin imposes occupational taxes on operators of metalliferous mines, Wis.Stat. Ann. §§ 70.37–70.396 (West 1989 & Supp. 1991), grain storage facilities, *id.,* § 70.41, scrap iron and scrap steel docks, *id.,* § 70.415, coal docks, *id.,* § 70.42, crude oil refineries, *id.,* § 70.421, and mink farms, *id.,* § 70.425. The state also taxes iron ore concentrates docks, specifically the three docks in Superior, Wisconsin leased or owned by the Burlington Northern Railroad ("BN"). *Id.,* § 70.40. I agree with the majority that BN has established a prima facie case that the tax on iron ore concentrates docks discriminates against railroads within the meaning of 49 U.S.C. § 11503(b)(4). Unlike the majority, however, I believe a remand is needed to allow the City of Superior to present evidence that the various other occupational taxes Wisconsin imposes rebut the inference that the tax on concentrates docks discriminates against railroads. I respectfully dissent from that portion of the majority opinion.

The majority recognizes that the goals that led Congress to pass 49 U.S.C. § 11503 did not include "produc[ing] a tax exemption for railroads." *Ante at* 1188. Nevertheless, it concludes that once a railroad has identified a tax that uniquely burdens rail operations, that tax must be invalidated, regardless of whether the state imposes similar taxes on similarly situated taxpayers. I am unable to conclude that Congress intended to abandon the usual meaning of the word "discriminate," which implies the need to compare taxes on railroad operations with taxes imposed on other taxpayers. Rather, I read § 11503(b)(4) to require that states be allowed to rebut the inference of discrimination that may be drawn from a tax on a freight facility used only by railroads with evidence that these facilities are taxed no more heavily than other, similar facilities which depend on road, pipeline, or water, but not rail, connections.

Congress addressed more fully the proper analysis to be conducted in determining whether a tax discriminates against railroads in the provisions of § 11503(b) applicable to taxes on railroad property than in the provision concerning other forms of taxation we are called upon to apply here. In both § 11503(b)(1) and (b)(3), Congress explicitly identified the comparison group to be used in determining whether a property tax discriminates against railroads as "commercial and industrial property in the same assessment jurisdiction." By contrast, § 11503(b)(4), which invalidates any other form of discriminatory taxation against railroads, is silent on the question of how courts are to determine whether such taxes discriminate against railroads.[1]

The majority apparently draws from this silence the message that once it has been shown that a tax *affects* railroads, it is unnecessary to allow the state to present evidence that the tax in fact does not *discriminate* against railroads. Relying on

the Fifth Circuit's opinion in *Kansas City Southern Railway Co. v. McNamara,* 817 F.2d 368 (5th Cir.1987), the majority reasons that courts are poorly equipped to evaluate "whether different taxes on other activities might offset the burden on the railroad industry of a tax limited to railroads." *Ante at* 1188. The majority acknowledges that such an analysis has been a consistent feature of cases in which state taxes are challenged on the ground that they burden interstate commerce or deny equal protection to out-of-state taxpayers. *See, e.g., Goldberg v. Sweet,* 488 U.S. 252, 267, 109 S.Ct. 582, 592, 102 L.Ed.2d 607 (1989); *D.H. Holmes & Co. v. McNamara,* 486 U.S. 24, 32, 108 S.Ct. 1619, 1624, 100 L.Ed.2d 21 (1988). However, it distinguishes those cases because they arose in the course of constitutional adjudication, where the Supreme Court "is operating without the benefit of a congressional policy directive."

Like the majority, I read § 11503(b)(4) as "a policy directive." And like the majority, I glean the meaning of this policy directive by "reading subsection (4) ... in light of the approach taken in the first three subsections." *Ante at* 1188. I am unable, however, to join the majority's view that the intent of Congress we can derive from two subsections in which Congress directs courts to analyze property taxes on railroads by comparing them to property taxes on other commercial and industrial taxpayers is that any other kind of tax on railroads is discriminatory *per se.* Rather the intent I infer is that a court called upon to decide whether a tax violates § 11503(b)(4) must perform an analysis like that set out in the prior subsections: it must compare the taxes imposed on railroads to like taxes imposed on other activities that do not have the requisite nexus with railroads. In Wisconsin this may include any of the range of occupational taxes the state imposes on facilities like grain elevators, oil refineries,

1. Perhaps this is because the provision that § 11503(b)(4) is indirectly derived from, § 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 54 ("the 4–R Act"), was "inserted three weeks before [the 4–R Act's] passage,

[and] represented a last minute realization by Congress that prohibiting only discriminatory property taxes would not be enough." *Richmond, Fredericksburg & Potomac R.R. Co. v. Department of Taxation,* 762 F.2d 375, 380 (4th Cir.1985).

scrap metal docks, coal docks, and ore mines.

This approach, which compares occupational taxes on activities only railroads engage in with activities that may rely on other forms of transportation, is substantially less ambitious than the open-ended comparison of benefits, burdens, and incidence employed in Commerce Clause cases. Nevertheless, it answers the central question of whether a state taxes railroads only "as members of a larger taxpayer group," *ante at* 1188, defeating the inference that a tax on railroad activities is part and parcel of the history of discriminatory taxation against railroads that Congress sought to bring to an end in passing § 11503.[2]

I recognize that the view the majority adopts today has previously won the favor of the Fifth Circuit in *Kansas City Southern* and the Eighth Circuit in its recent opinion in *Trailer Train v. State Tax Comm'n*, 929 F.2d 1300 (1991). Both of these opinions relied on *Arizona Public Service Co. v. Snead*, 441 U.S. 141, 99 S.Ct. 1629, 60 L.Ed.2d 106 (1979), to reach the conclusion that no discrimination analysis was necessary. In *Snead*, the Supreme Court held that the appropriate way to determine whether a state tax contravened an act of Congress was "[t]o look narrowly to the type of tax the federal statute names, rather than to consider the entire tax structure of the State." *Id.* at 149–50, 99 S.Ct. at 1633–34. Applying this approach, the Court in *Snead* struck down a New Mexico statute on electricity generated in the state and exported elsewhere as inconsistent with a statute Congress had passed prohibiting discriminatory taxes on power sold out of state. As the defendant in *Snead* conceded, Congress's enactment was aimed directly at the New Mexico tax; indeed, the sponsors of the statute had gone so far as to identify the New Mexico tax by name. *See* 441 U.S. at 147–48, 99 S.Ct. at 1632–33. Striking down the tax regardless of whatever other activities New Mexico might tax was thus "faithful not only to the language of the statute but to the expressed intent of Congress in enacting it." *Id.* at 150, 99 S.Ct. at 1634.

So, I contend, is the approach recommended here. By comparing state taxes on activities engaged in solely by railroads with similar activities that do not have a similar nexus with rail transportation, courts could distinguish taxes on railroads from taxes that form part of a comprehensive state scheme to impose special burdens on activities that state legislators conclude have an unusual impact on scarce resources. It would also avoid the harsh consequences that applying § 11503(b)(4) without looking to similar taxes levied on other taxpayers will often produce.[3] The

---

2. Cf. *McGoldrick v. Berwind–White Co.*, 309 U.S. 33, 46 n. 2, 60 S.Ct. 388, 392 n. 2, 84 L.Ed. 565 (1940) ("Lying back of [Commerce Clause jurisprudence] is the recognized danger that, to the extent that the burden falls on economic interests without the state, it is not likely to be alleviated by those political restraints which are normally exerted on legislation where it affects adversely interests within the state.").

3. In *McNamara*, the Fifth Circuit recognized that applying *Snead*'s rule that no inquiry into discriminatory effect is needed when a state tax statute is challenged as violating an act of Congress might well have unjust results. *See id.* at 375 (state tax may be struck down under § 11503(b)(4) even where tax "is perfectly fair" to railroads). Judge Floyd Gibson, dissenting from the Eighth Circuit's recent *Trailer Train* decision, also pointed to the potential for strange results under the statute, concluding that a demonstration that state taxes on railroads disadvantaged railroads relative to other taxpayers was "necessary lest Congress be open-

ly called a fool." *Trailer Train*, 929 F.2d at 1305.

Congress's wish to avoid being called a fool may be surmised from two anti-discrimination statutes passed since *Snead*. In 1980, Congress enacted 49 U.S.C. § 11503a, which tracks the language of § 11503, except that the phrase "motor carrier transportation property" is substituted for "rail transportation property." There is, however, one more difference in the otherwise identical statutes: § 11503a contains no provision analogous to § 11503(b)(4). In 1982 Congress amended 49 U.S.C. § 1513(d), which bars discriminatory state taxation of airline operating property. Again, this provision is for the most part identical to §§ 11503(b) and § 11503a(b). The only differences are the substitution of the phrase "air carrier transportation property" for "rail transportation property" and "motor carrier transportation property" respectively, and, again, the omission of a provision analogous to § 11503(b)(4).

present state of the record in this case does not permit such an examination, and the majority's reading of the statute renders it superfluous. Because this reading favors railroads to a degree far beyond the intention of the legislators who drafted § 11503(b)(4), I respectfully dissent.