**THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, and UNION PACIFIC RAILROAD CO., Plaintiffs,**

v.

**Earl ATWOOD, Director, Wyoming Department of Revenue, Defendant.**

No. 00–CV–108–J.

United States District Court, D. Wyoming.

April 22, 2003.

---

Terry L Armitage, Wyoming Attorney General, Cheyenne, WY, Vicci M Colgan, Wyoming Attorney General, Cheyenne, WY, Michael Dinnerstein, New York City Law Department, New York, NY, for Defendant.

W Perry Dray, Gregory C Dyekman, Dray Thomson & Dyekman, Cheyenne, WY, for Plaintiffs.

James W McBride, Baker Donelson Bearman & Caldwell, Washington, DC, for Burlington Northern Santa Fe Railway Company.

## ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ALAN B. JOHNSON, District Judge.

The plaintiffs' Motion for Summary Judgment and the defendant's opposition to the motion came before the Court for consideration. A hearing was held April 11, 2003 at which counsel for the parties appeared and presented their respective arguments. The Court, having considered the parties' written submissions, the pleadings of record, the applicable law, their arguments at the hearing, and being fully advised, FINDS that the plaintiffs' motion for summary judgment should be GRANTED, for the reasons stated below.

### Background

Plaintiffs' Motion for Summary Judgment seeks a determination that the Wyoming Coal Transportation Tax violates the federal 4–R act, Section 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act of 1976, codified at 49 U.S.C. § 11501, in that it results in discriminatory taxation of the plaintiffs, Burlington Northern and Santa Fe Railway Company ("BNSF") and Union Pacific Railroad Company ("UP"), in violation of Section

306 of the Act. Plaintiffs seek summary judgment declaring that the assessment, levy, and collection of the Coal Transportation Tax on BNSF's and UP's transportation of coal in Wyoming is illegal and invalid and permanently enjoining the defendant, the director of the Wyoming Department of Revenue from assessing, levying or collecting the Coal Transportation Tax from BNSF and UP. The defendant opposes the motion and asserts the tax is not a discriminatory tax. It is a tax which applies equally to all who transport coal, without distinction, in view of the defendant.

There is no dispute between the parties as to the relevant facts in this case. BNSF and UP are both interstate common carriers subject to the jurisdiction of the Surface Transportation Board and are both doing business in Wyoming.

Wyoming Statutes §§ 39–21–101 through 39–21–111 impose an excise tax known as the Excise Tax on the Commercial Transportation of Coal ("Coal Transportation Tax") on each person commercially transporting coal in Wyoming. The Coal Transportation Tax was enacted by the Wyoming Legislature in its 2000 Term as Enrolled Act No. 60, and became law without the Governor's signature on March 20, 2000; it became effective on January 1, 2001.[1]

The Coal Transportation Tax is imposed at the rate of one-tenth of one mill (.0001) for each ton, or portion thereof, of coal commercially transported per mile, or portion thereof, in Wyoming. There is a minimum tax of fifty cents ($.50) per truck, trailer, or railcar used to transport coal. Wyo. Stat. § 39–21–104.

"Commercial transportation of coal" is defined as the movement of coal using equipment authorized for use on public roads or railroads by private, contract, or common carriers. Wyo. Stat. § 39–21–101. This definition excludes all movement of coal that is in or near the mine, and all movement of coal that is not on public roads.

By May 1 of each year, each person commercially transporting coal in Wyoming must submit to the Wyoming Department of Revenue a report of its total amount of tons of coal and total miles transported in Wyoming during the previous calendar year. The tax is due to be paid in full on the date of the reporting and is delinquent if it is not paid by May 1. Wyo. Stat. § 39–21–107.

The Department of Revenue, as administered by the Director, is charged with enforcing all provisions of the Coal Transportation Tax, including collection of the tax. Wyo. Stat. § 39–21–102.

The first returns for the 2001 tax years were due to be filed by companies subject to the tax on May 1, 2002. (BNSF and UP did not file returns pursuant to the Consent Injunction issued by this Court.) Each company filing a return must list the number of tons of coal transported in Wyoming, the number of miles transported in Wyoming, and the total ton miles of coal transported in Wyoming (number of tons transported multiplied by the number of miles traveled). That amount is multiplied by the levy rate (.0001) to obtain the amount of the tax. In addition, each company must report the number of loads transported by truck, trailer, or railcar, and multiply that by $.50. Whichever amount is higher is the amount of tax due.

For the 2001 tax year, fourteen companies, mostly motor carriers, filed returns

---

1. The Act is included in the Appendix at the end of this Order.

with the Department of Revenue. Those companies reported a combined total of 1,412,268.54 tons of coal transported in Wyoming and 36,560 loads carried. They paid a combined total of $18,622.34 in tax. See Exhibit 3, Deposition of Ken Uhrich.

In calendar year 2001, BNSF transported 187 million tons of coal in Wyoming. It transported that coal an average of 139 miles in Wyoming. This results in total ton miles in Wyoming of 25,948,751,219. That amount multiplied by the tax levy rate (.0001) would result in a tax liability of $2,594,875 for BNSF for the 2001 tax year. Using the alternative calculation, BNSF carried 1,617,700 carloads of coal in Wyoming during 2001. That number multiplied by $ .50 would result in a tax liability of $808,899 for the 2001 tax year. Because each company must pay the higher of the two calculations, BNSF would be liable for $2,594,875 in Coal Transportation Tax for 2001. Affidavit of Jerry C. Bartlett.

In calendar year 2001, UP transported 169 million tons of coal in Wyoming. It transported that coal an average of 186 miles in Wyoming. This results in total ton miles in Wyoming of 31,466,044,208. That amount multiplied by the tax levy rate (.0001) would result in a tax liability of $3,146,604 for UP for the 2001 tax year. Using the alternate calculation, UP carried 1,473,635 carloads of coal in Wyoming during 2001. That number multiplied by $.50 would result in a tax liability of $736,818 for the 2001 tax year. Because each company must pay the higher of the two calculations, UP would be liable for $3,146,004 in Coal Transportation Tax for 2001. Affidavit of William E. Nock.

In 2001, BNSF and UP between them carried 356,000,000 tons of coal in Wyoming, compared to a total of 1,412,268 tons carried by all other carriers combined.

The total tax imposed on BNSF and UP would be $5,741,479, compared to a total of $18,622.34 for all other carriers combined. Therefore, BNSF and UP carried 99.6% of the coal transported in Wyoming that was subject to this tax and would be liable for 99.7% of the total Coal Transportation Tax liability.

## Discussion

The federal 4–R Act, Section 306(1)(d) of the Railroad Revitalization and Regulatory Reform Act of 1976, and codified at 49 U.S.C. § 11501, prohibits the imposition of "any other tax which results in discriminatory treatment of a common carrier by rail." The act provides:

§ 11501. Tax discrimination against rail transportation property

(a) In this section—

(1) the term 'assessment' means valuation for a property tax levied by a taxing district;

(2) the term 'assessment jurisdiction' means a geographical area in a State used in determining the assessed value of property for ad valorem taxation;

(3) the term 'rail transportation property' means property, as defined by the Board, owned or used by a rail carrier providing transportation subject to the jurisdiction of the Board under this part; and

(4) the term 'commercial and industrial property' means property, other than transportation property and land used primarily for agricultural purposes or timber growing, devoted to a commercial or industrial use and subject to a property tax levy.

(b) **The following acts unreasonably burden and discriminate against in-**

terstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

(1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.

(3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate Applicable to commercial and industrial property in the same assessment jurisdiction.

(4) **Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.**

(c) Notwithstanding section 1341 of title 28 and without regard to the amount in controversy or citizenship of the parties, a district court of the United States has jurisdiction, concurrent with other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this section. Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction. The burden of proof in determining assessed value and true market value is governed by State law. If the ratio of the assessed value of other commercial and industrial property in the assessment jurisdiction to the true market value of all other commercial and industrial property cannot be determined to the satisfaction of the district court through the random-sampling method known as a sales assessment ratio study (to be carried out under statistical principles applicable to such a study), the court shall find, as a violation of this section—

(1) an assessment of the rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the assessed value of all other property subject to a property tax levy in the assessment jurisdiction has to the true market value of all other commercial and industrial property; and

(2) the collection of an ad valorem property tax on the rail transportation property at a tax rate that exceeds the tax ratio rate applicable to taxable property in the taxing district.

49 U.S.C. § 11501 (emphasis supplied).

Although it nominally applies to anyone commercially transporting coal in Wyoming, the Wyoming Coal Transportation Tax of Wyo. Stat. §§ 39–21–101 through 39–21–111, singles out railroads in that they are liable for more than 99% of the total Coal Transportation Tax.

This case is not meaningfully distinguishable from that discussed by Judge Posner in *Burlington Northern Railroad Co. v. City of Superior*, 932 F.2d 1185 (7th Cir.1991). In that case Judge Posner discussed the underlying rationale for enactment of Section 306. He states, in part:

... Railroads have long been attractive targets for state and local taxing authorities: so many railroad assets are at once specialized to railroading and physically immobile that it is very difficult for railroads to escape heavy taxation by transferring the assets to another industry or location; in other words, the "exit" option for limiting political exploitation is denied them. By the 1960s the railroads were in permanent decline. Section 306 was an effort to lift from their backs some of the heavy hand of state and local taxation....

*Burlington Northern Railroad Co. v. City of Superior*, 932 F.2d at 1186.

Further, responding to the argument of the taxing authority that another entity, not a railroad, could also be subject to the tax by operating the iron ore concentrates docks giving rise to the at-issue tax, Judge Posner states:

> The response is wide of the mark. Who conducts the activity that is taxed is irrelevant. The tax will increase the cost of the activity, to the railroad's detriment. The statute applies to taxes on rail transportation property and to other taxes if they discriminate against rail-carriers; it thus is not limited to cases in which the railroad is the taxpayer.
>
> But we have still to evaluate the per se rule that the railroad argues for. The federal statute is aimed primarily at property taxes and as to them it sets forth clear standards designed to prevent the placing of an excess burden on railroads. Subsection (b)(4) is a catch-all designed to prevent the state from accomplishing the forbidden end of discriminating against railroads by substituting another type of tax. It could be an income tax, a gross-receipts tax, a use tax, an occupation tax as in this case—whatever....

> \*　　\*　　\*　　\*　　\*　　\*

The preceding subsections of the statute, perhaps to facilitate administration of the statute, **forbid states to tax railroad property proportionately more heavily than other commercial and industrial property,** even if the railroad derives a greater benefit from the public services defrayed by the tax. By analogy, **we may assume that a tax is "discriminatory" within the meaning of the fourth subsection if it imposes a proportionately heavier tax on railroading than on other activities, even if the taxing authority might be able to show that the activity imposes a disproportionate burden on public services**.... A tax that, as in this case, is imposed on an activity in which only a railroad or railroads engage—such as placing iron ore concentrates on wharves—is prima facie discriminatory under the suggested test. It could be a tax on operating rail crossing signals, on selling railroad passenger tickets, on loading tank cars, on hoisting containers from flat cars onto flatbed trucks—or on placing iron ore concentrates shipped by rail on wharves for further shipment, a form of unloading.

Should the taxing authority be allowed to rebut the prima facie case of discrimination by showing that taxes on equivalent services eliminate any discrimination against rail carriers? Maybe the tax is on railroad boxcars ... but the taxing authority presents evidence that there is an equal tax on truck trailers. Would the burden then shift back to the railroad to produce evidence that the apparent neutrality of the tax system considered as a whole is spurious? If so, this case may have a long life. Coal, iron ore concentrates, and other goods shipped by rail are not the only goods that are loaded onto ships docked at the

city of Superior. We do not know how the operators of the wharves on which those goods are placed for loading are taxed. Maybe like the operator of the coal dock they pay 5 cents a ton. That would make it like our railroad boxcar and truck trailer case, and under the approach we are considering the burden would shift back to the operator to show that, perhaps because iron ore concentrates are much heavier than other things shipped by boat, the tax system, considered as a whole, burdens railroads disproportionately.

Since the railroad made in our view a prima facie case simply by proving that the tax was imposed on an activity (the operation of iron ore concentrates docks) in which only a railroad engages, the district judge erred in granting summary judgment for the city. The harder question is whether the case should go back to the district court for a trial at which the city ... would be entitled to present evidence that the tax on the railroad's wharves is not discriminatory when other taxes on comparable services are factored into the analysis, or, as the railroad argues, whether rebuttal should be precluded and the tax deemed discriminatory per se.

The Fifth Circuit's powerful opinion in *McNamara* recommends the second course; *see also Trailer Train Co. v. State Tax Comm'n, supra,* [929 F.2d 1300] at 1302 [8th Cir.1991]. The court thought it unrealistic to suppose that the overall burden of a state's tax system could be rationally evaluated by the methods of litigation—unrealistic to think a court could figure out whether different taxes on other activities might offset the burden on the railroad industry of a tax limited to railroads. It is true that the Supreme Court sometimes attempts that type of ambitious inquiry in cases in which state taxes are challenged under the commerce or equal protection clauses of the Constitution.... But in those areas the Court is operating without the benefit of a congressional policy directive. Reading subsection (b)(4) of our statute in light of the approach taken in the first three subsections, we infer a congressional desire that courts avoid the thicket of incidence analysis and forbid states to single out railroads for taxation, as was done here by levying a tax on an activity in which, in Wisconsin anyway, only railroads engage. The state is confined to taxing railroads as members of larger taxpayer groups—owners of commercial or industrial property, recipients of gross income, recipients of net income, whatever. It cannot levy a tax on inputs into railroading alone.

To all legal generalizations (well, almost all) there are exceptions. We can imagine a case in which a railroad so dominated the economy of a jurisdiction that a tax general in form—a property tax on commercial and industrial property—was in fact a tax on railroads alone, because the railroads were the only owners of such property in the jurisdiction. Or suppose Superior levied a tax on theater receipts, and the Burlington Northern then bought the only theater in town. In either case, the application of the standard of *McNamara* would produce a tax exemption for railroads, which was not the intention behind section 306(d). We can deal with such cases when and if they arise. For today it is enough to hold that a state cannot be allowed to place staggering burdens of inquiry on the judicial system by picking out a narrow class of activities that just happen to be engaged in solely by

railroads, or a narrow set of inputs (box-cars, for example) that just happen to be used only in railroading; taxing that class, and asking the court to consider whether the state's tax system as a whole avoids burdening the railroad industry disproportionately.

Another difficult question that we need not decide today is how the judicial inquiry should be structured if the tax is imposed on an activity in which the railroads are not the sole, but are the principal, actors. Suppose a tax of 5 cents per ton handled by all docks in the State of Wisconsin is levied, and railroads handle 85 percent of all the cargo handled in Wisconsin. *Trailer Train v. Leuenberger,* 885 F.2d [415] at 418 [8th Cir.1988], **holds, sensibly in our view, that the inclusion of some nonrail activities in a class of activities dominated by railroads does not immunize a tax from challenge under section 306.** But what sort of proof the railroad must present and what rebuttals or defenses are available to the taxing authority are questions for another day.

*Burlington Northern Railroad Co. v. City of Superior,* 932 F.2d at 1186–1188 (most citations omitted) (emphasis supplied).

In *Trailer Train Co. v. Leuenberger,* 885 F.2d 415 (8th Cir.1988), the Eighth Circuit rejected the notion that a particular tax formulation could be upheld by making sure that a few other taxpayers pay the same type of tax. In that case, the court considered taxation of personal property and the argument that Nebraska's tax scheme, on its face, deliberately and openly discriminated against rail transportation property and further considered the opposing argument that "under Nebraska's tax scheme, all commercial and industrial personal property in the nature of business

equipment is subject to taxation, either through local assessment or by central assessment." 885 F.2d at 417. It stated:

Although the provisions of the taxing statutes involved in these three states differ, the results are the same. Section 306(1)(d) prohibits the imposition of any other tax that *results in discrimination* against railroads.... Tax exemptions are to be considered in determining whether there has been discriminatory treatment under § 306(1)(d).... It make no difference whether the discriminatory result is achieved by exempting locally assessed property or exempting the property of particular business, the railroads are being discriminated against contrary to section 306(1)(d). The North Dakota and Iowa statutes gave tax benefits to certain taxpayers, those assessed locally. The Nebraska statute, instead, exempts certain kinds of personal property from taxation whether assessed locally or centrally. However, except for motor vehicles paying registration fees and business inventories, the exemptions apply only to agriculturally related personal property. Nebraska, through the use of exemptions has, in effect, given benefits to those taxpayers involved in agriculture which are denied to taxpayers involved in other business or industries. The exemptions are specific. Only taxpayers involved in agriculture are likely to own any of the exempted personal property. It is equally unlikely that those involved in agriculture would own any operating railcars. Thus, the result is that the exemptions apply to certain taxpayers, the same as the North Dakota and Iowa statutes.

The problem with a statute such as N.C.Gen.Stat. § 105–277(a) is not that it grants tax breaks for certain agri-

cultural product. But the problem is that if states are allowed to grant tax reductions to an increasing number of property items without taking into account the effect on the taxation of railroad property, the antidiscriminatory spirit and intent of § 306 would soon be swallowed up in the exceptions.

*Clinchfield R. Co. v. Lynch,* 784 F.2d 545, 552 (4th Cir.1986).

When the exemptions apply to three-fourths of the commercial and industrial property in Nebraska, and do not apply to rail cars, the tax system in Nebraska discriminates against Trailer Train and violates § 306(1)(d) of the 4–R act.

**The fact that other taxpayers are also subjected to the personal property tax does not render appellants actions against Trailer Train nondiscriminatory.** Discrimination against a taxpayer protected by § 306(1)(d) cannot be justified because others are also victims of discrimination. *Burlington Northern R. Co. v. Bair,* 766 F.2d 1222, 1224 (8th Cir.1985); *Ogilvie v. State Board of Equalization,* 492 F.Supp. 446, 455 (D.N.D.1980).

*Trailer Train Company v. Leuenberger,* 885 F.2d at 417–418 (most citations omitted) (emphasis supplied). See also *Kansas City Southern Railway Co. v. McNamara,* 817 F.2d 368, 375 n. 13 (5th Cir.1987)("The district court held that the proper comparison group under § 11503(b)(4) is 'other commercial and industrial taxpayers which pay the same type of tax.' 624 F.Supp. at

399. The problem with this formulation is that it appears to allow the state to discriminate against the railroads by simply making sure that only a few powerless business taxpayers pay 'the same type of tax.' ").[2]

The defendant has argued that the tax at issue in this case is one designed to tax one of Wyoming's primary resources, coal. The obvious difficulty with this argument is that the tax is not on the coal, but is instead an excise tax imposed on the transportation of the coal. If the legislature truly desired to achieve maximum tax benefit from taxation of one of this State's primary natural extractive resources, it could do so easily, without resulting in a discriminatory tax on railroads, simply by increasing or otherwise modifying the severance taxes imposed on coal, for example. The defendant's arguments are not persuasive.

In this case, the Court finds that the Coal Transportation Tax singles out railroads for the imposition of a tax that is not generally applicable to other commercial and industrial taxpayers and that tax results in a discriminatory treatment of common carriers by rail. The fact that it also applies to a very small number of other taxpayers who will pay considerably less than 1% of the tax does not diminish this fact. The Coal Transportation Tax violates the provisions of Section 306(1)(d) prohibiting the imposition of any other tax which results in discriminatory treatment of a common carrier by rail.

The Court finds and concludes, therefore, that the plaintiffs are entitled to sum-

---

**2.** The history of the 4–R act with its various recodifications are noted in *CSX Transportation, Inc. v. Board of Public Works of the State of West Virginia,* Unpublished Disposition, 40 Fed.Appx. 800, n. 1 (4th Cir.2002), noting that Section 306 has twice been recodified, but the

recodifications were not intended to make any substantive changes to the statute. "We cite to the current codification of section 306 at 49 U.S.C. § 11501, but refer to the state in the text at section 306 of the 4–R Act."

mary judgment in their favor as a matter of law and that their motion for summary judgment should be granted. The Court further finds and concludes that the relief requested by plaintiffs, including an order permanently enjoining the defendant, Director of the Wyoming Department of Revenue and all those acting in concert and participation with him, from assessing, levying, or collecting the Coal Transportation Tax from the plaintiffs, should be granted.

Accordingly, it is therefore

**ORDERED** that the plaintiff's Motion for Summary Judgment shall be, and is, **GRANTED.** It is further

**ORDERED** that the defendant Director of the Wyoming Department of Revenue and all those acting in concert and participation with him, shall be, and is, **PERMANENTLY ENJOINED FROM ASSESSING, LEVYING, OR COLLECTING THE COAL TRANSPORTATION TAX IMPOSED BY WYO. STAT. §§ 39–21–101 through 39–21–111.**

### APPENDIX

### Chapter 21. Excise Tax on Commercial Transportation of Coal

§ 39–21–101.  Definitions.

(a) As used in this chapter:

(i) "Department" means the department of revenue;

(ii) "Commercial transportation of coal" means the movement of coal using equipment authorized for use on public roads or railroads by private, contract or common carriers.

§ 39–21–102.  Administration.

The department of revenue shall enforce the provisions of this chapter. The de-partment shall promulgate rules and regulations necessary for the implementation and enforcement of this chapter.

§ 39–21–103.  Imposition.

There is levied an excise tax on each person commercially transporting coal in this state. The tax shall be applied to any person commercially transporting coal within the state of Wyoming.

§ 39–21–104.  Taxation rate.

(a) The tax shall be levied at the rate of one-tenth of one mill (.0001) for each ton, or portion thereof, of coal commercially transported per mile, or portion thereof, in this state. The tax shall be imposed upon any coal produced in this state.

(b) In no event shall the tax upon any person commercially transporting coal in this state be less than fifty cents ($.50) per truck, trailer or railcar used to transport coal.

§ 39–21–105.  Exemptions.

The tax imposed by this chapter shall not apply to any person transporting coal for his own personal use and not for commercial gain.

§ 39–21–106.  Licensing; permits.

There are no specific applicable provisions for licensing and permit for this chapter.

§ 39–21–107.  Compliance; collection procedures.

(a) Returns and reports.  On or before May 1 of each year, each person commercially transporting coal in this state shall submit to the department of revenue, on forms prescribed by the department of revenue, a report of the total amount of tons of coal and total miles transported in this state during the previous calendar year.

(b) Payment. All taxes shall be due on the date of reporting and shall be delinquent if not paid on or before May 1. The department of revenue shall collect the tax due pursuant to this chapter from each person liable for the tax imposed by this chapter.

(c) Timelines. There are no specific applicable provisions for timelines for this chapter.

§ 39–21–108.  Enforcement.

(a) Audits. There are no specific applicable provisions for audits for this chapter.

(b) Interest. Interest at an annual rate equal to the average prime interest rate as determined by the state treasurer during the preceding fiscal year plus four percent (4%) shall be added to all delinquent taxes under this chapter.  To determine the average prime interest rate, the state treasurer shall average the prime interest rate for at least seventy-five percent (75%) of the thirty (30) largest banks in the United States.  The interest rate on delinquent taxes shall be adjusted on January 1 of each year following the year in which taxes first became delinquent.  In no instance shall the delinquent tax rate be less than twelve percent (12%) nor greater than eighteen percent (18%).

(c) Penalties. The following shall apply:

(i) If any person fails to make or file a return and remit the tax as required by this chapter the department shall impose a penalty of five percent (5%) of the taxes due for each thirty (30) day period, or fraction thereof, elapsing between the due date of the return and the date filed, unless the person for good cause obtains from the department an extension of time for filing prior to the due date for filing.  In no event shall the

total penalty imposed by this paragraph exceed twenty-five percent (25%) of the tax due.  The department, for good cause, may waive a penalty imposed for failure to file a return as required by this section, provided that:

(A) The return was filed within five (5) business days following the due date, including an approved extension period; and

(B) The taxpayer requests the waiver in writing within fifteen (15) days after the return was filed, setting forth the reasons for the late filing.

(ii) If any part of a tax deficiency is due to negligence or intentional disregard of rules and regulations there shall be added a penalty of five percent (5%) of the amount of the deficiency plus interest as provided by subsection (b) of this section.  The taxes, penalty and interest shall be paid by the taxpayer within ten (10) days after receipt of notice and demand by the department;

(iii) Taxes due together with interest, penalties and costs shall be collectible by the department by appropriate judicial proceedings;

(iv) The department may credit or waive penalties imposed by this section as part of a settlement or for any other good cause.

(d) Liens. Any delinquent tax is a lien upon any property of any person owing the tax, from and after the time the tax is due until the tax is paid.  The tax lien shall have preference over all liens except any valid mortgage or other liens of record file or recorded prior to the date the tax became due.

(e) Tax sales.  There are no specific applicable provisions for tax sales for this chapter.

§ 39–21–109.   Taxpayer remedies.

The tax imposed and paid pursuant to this chapter shall be a tax credit against sales taxes paid by the same person when that person is except from the fuel tax due under W.S. 39–17–104(a) or 39–17–204(a), but is not exempt from sales tax on that fuel.

§ 39–21–110.   Statute of limitations.

There are no specific applicable provisions for a statute of limitations for this chapter.

§ 39–21–111.   Distribution.

All net revenues derived from the tax imposed by this chapter shall be deposited into an escrow account until such time as the attorney general certifies to the governor and the legislature that no obligations remain attached to the tax collections.   No expenditure shall be made from the escrow account except as authorized under this section.   At the time of certification, all net revenues derived from the tax and all amounts within the escrow account shall be transferred to the permanent Wyoming mineral trust fund.