# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 10-2630

———————

Midwest Railcar Repair, Inc.,     \*
                            \*

        Appellant,             \*
                            \*    Appeal from the United States

    v.                           \*    District Court for the
                            \*    District of South Dakota.

South Dakota Department of Revenue    \*
and Regulation,                      \*
                            \*

        Appellee.               \*

———————

Submitted: February 16, 2011
Filed: October 14, 2011

———————

Before RILEY, Chief Judge, WOLLMAN, and BYE, Circuit Judges.

———————

WOLLMAN, Circuit Judge.

This action by Midwest Railcar Repair, Inc. (Midwest) against the South Dakota Department of Revenue and Regulation (the Department), seeks a declaration that South Dakota has a taxation scheme that violates a provision of the federal Railroad Revitalization and Regulatory Reform Act (4-R Act), namely, 49 U.S.C. § 11501(b)(4). The complaint alleges in part that "[t]he 4-R Act's bar on discriminatory taxes against rail carriers extends to Midwest Railcar Repair." Following discovery, both Midwest and the Department moved for summary judgment. The district court denied Midwest's motion and granted the Department's, concluding that our cases "do no support extending the protections of the 4-R Act to

Midwest," D. Ct. Order of June 23, 2010, at 6, a "privately owned compan[y] . . . that service[s] railroad carriers," id., at 4. Midwest appeals.

The history of the 4-R Act has been well summarized by the United States Supreme Court: "[R]ailroads are easy prey for State and local tax assessors in that they are nonvoting, often nonresident, targets for local taxation, who cannot easily remove themselves from the locality." Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 336 (1994) (internal quotation marks omitted). So to remove the "temptation to excessively tax" railroads "to subsidize general welfare spending," W. Air Lines, Inc. v. Bd. of Equalization of S.D., 480 U.S. 123, 131 (1987), Congress enacted the 4-R Act to restore the financial stability of the nation's railway system, one of the means of achieving that goal being the 4-R Act's prohibition of certain "state and local taxation schemes that discriminate against rail carriers." CSX Transp., Inc. v. Ala. Dep't of Revenue, 131 S. Ct. 1101, 1105 (2011).

I.

A. The Taxation Scheme

Repair services in South Dakota—including those provided by Midwest—are subject to a sales and complementary use tax. See S.D. Codified Laws §§ 10-45-4, 10-46-2.1.[1] Similarly, the parts and other "tangible personal property" used in those repairs are subject to a sales and complementary use tax. See id. §§ 10-45-2, 10-46-2.

---

[1]Sales and use taxes are complementary in that a

> sales-use tax scheme is designed to make all tangible personal property, whether acquired in, or out of, the state subject to a uniform tax burden. The two taxes, sales and use, are mutually exclusive but complementary and are designed to exact an equal tax based on the percentage of the purchase price of the property in question.

67B Am. Jur. 2d Sales and Use Taxes § 1 (2010) (footnote omitted); see Matter of Sales and Use Tax Refund Request of Media One, Inc., 559 N.W.2d 875, 882 n.17 (S.D. 1997); see also Palmer Dep. at 18:5-19:8.

There is no use tax, however, on the "tangible personal property that is used or consumed or stored for use and consumption in the service, repair, or maintenance of" aircraft "used in air commerce." See id. §§ 10-29-1(4), 10-29-18. Rather, those aircraft are taxed, as a general matter, on their total value. See id. § 10-29-14.[2] Midwest's complaint is that South Dakota's imposition of a use tax on the "tangible personal property" Midwest uses to repair railcars, while exempting "tangible personal property" used to repair aircraft, violates the 4-R Act because it is tantamount to imposing "another tax that discriminates against a rail carrier." 49 U.S.C. § 11501(b)(4).

## B. Midwest

Midwest is a South Dakota corporation "in the business of repairing and refurbishing railcars for rail carriers." Compl. ¶ 2. Its current owner and president, Greg Carmon, has worked for the company since 1979, at which time it was called the North American Car Corporation. Carmon Dep. at 5:22-6:16. In 1984, General Electric bought the company, and in 1988, Carmon bought it from General Electric. Id.

According to Carmon, Midwest repairs "about 200 [rail]cars a month," and its facilities can "hold about 650 cars" at any one time. Id. at 11:22-25. It works on railcars of "[a]ll types with the exception of locomotives, cabooses, [and] auto racks." Id. at 12:9-11. Most of the railcars Midwest repairs are "own[ed], purchase[d] and/or lease[d]" by rail carriers. Midwest's Answers to Department's Interrogs., at 3. Recently, its largest customer has been the Burlington Northern Santa Fe railroad.

---

[2]Midwest argues that South Dakota also exempts aircraft repair services—not just parts—from sales and use taxes. The district court assumed this to be true and based its ruling on an independent ground. In light of our affirmance on the ground relied upon by the district court, we need not rule on this issue.

Carmon Dep. at 11:7-11. But neither Burlington Northern Santa Fe nor "any other of [Midwest's] customers have any control over [Midwest's] operation." Id. at 12:1-5.

In addition to repairing railcars owned or leased by rail carriers, Midwest repairs railcars owned by Carmon's two other companies, CarMath and M&C Railcar (M&C). See id. at 10:16-19. These companies "own and lease railroad cars," id. at 7:8-12, to "probably . . . 50 different customers," including "General Mills, Cargill, ADM, DM&E Railroad, [and] Burlington Northern," id. at 10:16-11:6.

The relationship between Midwest, CarMath, and M&C is not clearly developed in the record. Although the Department describes CarMath and M&C as "subsidiary companies" of Midwest, Answer ¶ 3, Carmon describes CarMath and M&C as "other companies, entities [he] own[s]," Carmon Dep. at 7:11-12. The three companies apparently are sufficiently related to qualify for South Dakota's controlled-group tax exemption, see Palmer Dep. at 17:6-18:4, which, as a general matter, exempts one controlled-group member from the sales taxes it would otherwise be required to pay on the gross receipts from rendering services to another controlled-group member, see S.D. Codified Laws § 10-45-20.1. But, other than Carmon's sole ownership of all three companies, the record contains no evidence that Midwest, CarMath, and M&C share a common corporate structure or should otherwise be considered a single entity.

## C. The Claims

Before we turn to the question whether the district court properly granted summary judgment, we must identify the claim or claims that Midwest has brought. The 4-R Act

> bars States and localities from engaging in four forms of discriminatory taxation. Section 11501(b) describes the prohibited practices. It begins

with three provisions addressed specifically to property taxes; it concludes with a catch-all provision concerning other taxes.

CSX Transp., Inc., 131 S. Ct. at 1105 (citation omitted).

Sections 11501(b)(1) through (3), addressing discriminatory property taxes, are not at issue here. Midwest's claim is that South Dakota's taxation scheme violates the catch-all provision, § 11501(b)(4), which prohibits states from "impos[ing] another tax that discriminates against a rail carrier providing transportation . . . ."

Most of the challenges brought under § 11501(b)(4), like those brought under §§ 11501(b)(1) through (3), are brought by rail carriers directly. See, e.g., CSX Transp., Inc., 131 S. Ct. 1101; Burlington N. R.R. Co. v. City of Superior, Wis., 932 F.2d 1185 (7th Cir. 1991). This is not surprising, since "[]other tax[es]" that explicitly single out rail carriers—the very entities Congress named in § 11501(b)(4)—are readily identifiable and "immediately suspect." See Trailer Train Co. v. State Tax Comm'n, 929 F.2d 1300, 1305 (8th Cir. 1991) (Gibson, J., dissenting); cf. CSX Transp., Inc., 131 S. Ct. at 1110-13 (reiterating that property-tax exemptions discriminatorily denied rail carriers are permitted by §§ 11501(b)(1) through (3) "and accordingly § 11501(b)(4)'s prohibition could not include them"). And, because we do not examine "a state's overall tax structure" to look for "actual fairness" in taxation, but instead look only at whether the specific taxes paid by the railroads are also paid by its competitors, see Burlington N., Santa Fe Ry. Co. v. Lohman, 193 F.3d 984, 986 (8th Cir. 1999), taxes that explicitly single out rail carriers often will be found to "discriminate[] against a rail carrier."

Sometimes, however, claims for violations of the Act are brought by entities other than rail carriers. See, e.g., Dep't of Revenue of Or., 510 U.S. 332; Trailer Train Co. v. State Bd. of Equalization, 710 F.2d 468 (8th Cir. 1983). In Trailer Train Co., we considered a challenge to North Dakota's taxation scheme brought by two corporations, Trailer Train and Railbox (together, the Carlines), which were "in the

business of providing standardized railroad flat cars to railroad companies." Id. at 469. The Carlines had been "formed by thirty-two operating railroads, each of which became a shareholder . . . and a guarantor of certain [Carline] debt obligations," for the purpose of meeting "the demand for a nationwide fleet of flat cars." Id. at 469.

The Carlines would

acquire railroad cars by lease or purchase and furnish them, pursuant to car-service contracts, to railroads operating throughout the United States. Under these car-service contracts, the Carlines provide[d] sufficient numbers of cars to meet the railroads' demands in exchange for the railroads' payment of a per diem charge (and for some cars, an additional per mile charge), for the use of each car furnished. The [Interstate Commerce Commission] regulations and the car-service contracts require[d] the Carlines to keep their rates for car service at the "lowest level possible." The Carlines retain[ed] responsibility for the expenses and maintenance of all cars in their pool, including ad valorem taxes.

Id. at 469-70.

North Dakota had imposed an ad valorem property tax on the Carlines' personal property, i.e., the railcars they "furnished to operating railroads," but had exempted from such taxation the personal property of effectively all other "commercial and industrial taxpayers[']." Id. at 470. The Carlines sued the North-Dakota governmental units responsible for assessing and collecting the tax, asserting that North Dakota's taxation scheme violated the catch-all provision of the 4-R Act. At that time, the provision prohibited the "impos[ition of] another tax that discriminates against a rail carrier providing transportation," see 49 U.S.C. § 11503(b)(4) (Supp. III 1976), although we applied the statute's original text, which

prohibited "[t]he imposition of any other tax which results in discriminatory treatment of a common carrier by railroad," see 49 U.S.C. § 26c(1)(d) (1976).[3]

The Carlines conceded that they were not themselves "common carriers by railroad," see Trailer Train Co. v. State Bd. of Equalization, 710 F.2d at 471 n.5, but nevertheless maintained that they were "entitled to the protection afforded by" the Act, id. at 471. We agreed, reasoning "that because of the close relationship between the Carlines and common carriers by railroad, tax discrimination against [the Carlines] *results* in discriminatory treatment of common carriers by railroad." Id. We emphasized that the "close relationship between [the Carlines] and common carriers by railroad is amply demonstrated by the record in this case." Id.

That record demonstrated (1) that the Carlines were "owned by most of the major railroad systems in the United States," (2) that "virtually all of the major trunk and shortline railroad carriers in the United States contract[ed] with [the Carlines] for car service," (3) that "the common carriers by railroad that participate[d] in the pooling arrangement rel[ied] upon [the Carlines] to furnish cars at the lowest possible rates," and (4) that "common carriers that participate[d] in the pooling arrangement [we]re relieved of the financial burden of purchasing, leasing, managing, controlling and accounting for substantial numbers of their own cars." Id. Thus, "to the extent that discriminatory state ad valorem taxation impose[d] a financial burden on [the Carlines], that burden [was] plainly transferred to, and shared by, common carriers by the railroad." Id. at 471-72. In light of these circumstances, we concluded that the Carlines, although not railroads themselves, could nevertheless challenge North Dakota's tax.

---

[3]None of the revisions to this original language, including the 1995 revision to its current form, were intended to work a substantive change. See CSX Transp., Inc., 131 S. Ct. at 1105 n.1.

Subsequently, we permitted challenges by the Carlines to taxation schemes in Iowa and Missouri. See Trailer Train Co. v. State Tax Comm'n, 929 F.2d 1300, 1302 n.4 (8th Cir. 1991); Trailer Train Co. v. Bair, 765 F.2d 744, 745 (8th Cir. 1985).

We thus understand § 11501(b)(4) to permit challenges by two classes of plaintiffs: (1) railroads; and (2) other entities that can show "that because of the close relationship between [themselves] and common carriers by railroad, tax discrimination against [the non-railroad entities] *results* in discriminatory treatment of common carriers by railroad." Trailer Train Co. v. State Bd. of Equalization, 710 F.2d at 471; accord Burlington N. R.R. Co. v. City of Superior, Wis., 932 F.2d at 1186-88 ("Who conducts the activity that is taxed is irrelevant. The tax will increase the cost of the activity, to the railroad's detriment. . . . [The state] cannot levy a tax on inputs into railroading alone.").

Claims brought by railroads against taxation schemes that discriminate directly against railroads will be the easiest to prove. In those circumstances, there will be no doubt that the schemes "discriminate[] against [] rail carrier[s]." § 11501(b)(4). Conversely, claims brought by "other entities" will be more difficult to prove. There will always be a question whether the tax imposed on a non-railroad entity, even if it plainly discriminates against that entity, also "*results* in discriminatory treatment of common carriers by railroad." Trailer Train Co. v. State Bd. of Equalization, 710 F.2d at 471.

Midwest is not a "rail carrier"; it is an "other entity." Its challenge to South Dakota's tax must therefore include evidence that the tax—imposed directly on Midwest—nonetheless results in discriminatory treatment of a railroad. With that in mind, we turn to the district court's judgment.

## II.

After noting that "[t]he Department argues that protections of the 4-R Act do not extend to Midwest Railcar because it is not a 'rail carrier' under subsection (b)(4) of the statute," the district court discussed in some detail our decisions in the Trailer Train cases. D. Ct. Order of June 23, 2010, 4-6. It then concluded that

> Unlike the plaintiffs in the Trailer Train cases, Midwest Railcar's relationship with rail carriers is not nearly as close such that the Court can say that any discriminatory treatment of Midwest Railcar has the effect of discriminating against railroad carriers in violation of the 4-R Act. Midwest Railcar is purely a private company, unowned by any rail carrier and there is no evidence that as in the Trailer Train line of cases, the majority of rail carriers contract with Midwest Railcar. Additionally, unlike the plaintiffs in Trailer Train, Midwest Railcar is not providing transportation property, but is servicing such property by providing repairs and maintenance. The facts presented in the Trailer Train cases do not support extending the protections of the 4-R Act to Midwest Railcar.

Id. at 6.

We conclude that the district court's analysis aptly synthesized the reasoning set forth in our Trailer Train cases. The entities that were held to fall within the protection of the 4-R Act in those cases were in effect adjuncts, if indeed not corporate subsidiaries, of the railroads to which they provided rail cars, rather than unaffiliated enterprises that merely provided railcar repair services.

We conclude that in light of Midwest's bare assertions that South Dakota's tax has the effect of discriminating against rail carriers, the district court did not err in ruling as it did. Any ruling to the contrary would have required the district court to rely upon speculation with respect to whether South Dakota's taxes on railcar repair

services performed by a privately owned, third-party service provider and any tangible personal property used therein impermissibly result in discriminatory treatment of a rail carrier. Such speculation would have been an improper basis upon which to ground such a holding.

### III.

The judgment is affirmed.

BYE, Circuit Judge, dissenting.

The majority affirms concluding the district court would have been required to speculate about whether Midwest's provision of *services* to rail carriers, as opposed to the provision of rail transportation *property*, would have resulted in discriminatory treatment of a rail carrier in violation of the 4-R Act, and that such speculation would have been an improper basis for the district court to rule in Midwest's favor. The district court did not, however, rule against Midwest on the ground that ruling in its favor would have required it to speculate. The district court based its decision on what it gleaned as the rule of law which flows from the Trailer Train line of cases, i.e., that the Trailer Train cases do not support extending the protection of the 4-R Act to an entity which merely provides repair and maintenance services to a rail carrier, instead of providing transportation property to a rail carrier. Because I believe the district court erred in its legal analysis, I respectfully dissent.

I do not read anything in our Trailer Train line of cases which distinguishes between taxes on railroad-related services and taxes on railroad-related property. Rather, the key to determining whether the 4-R Act extends to an entity other than a rail carrier under the catch-all provision of 49 U.S.C. § 11501(b)(4) is whether the tax increases the cost of an activity to a rail carrier's detriment. Indeed, the majority itself acknowledges this point. See Ante at 8 (citing Burlington N. R.R. Co. v. City of

Superior, Wis., 932 F.2d 1185, 1186-88 (7th Cir. 1991) ("Who conducts the activity that is taxed is irrelevant. The tax will increase the cost of the activity, to the railroad's detriment. . . . [The state] cannot levy a tax on inputs into railroading alone.")).

Taxes on repair and maintenance services provided to a rail carrier can increase the cost of an activity to a rail carrier's detriment in like measure to taxes on the provision of property to a rail carrier. I find nothing in our Circuit's jurisprudence, other Circuits' jurisprudence, or the Supreme Court's jurisprudence, to support the district court's interpretation of the Trailer Train cases. Midwest established it performs railcar repairs and maintenance services for rail carriers. As a consequence, the financial burden the state of South Dakota imposes upon Midwest is transferred to, and shared by, rail carriers. I therefore believe the protection of the 4-R Act extends to Midwest.

I respectfully dissent.

_____