RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BNSF RAILWAY COMPANY (14-6285); CSX TRANSPORTATION, INC. (14-6286); ILLINOIS CENTRAL RAILROAD COMPANY (14-6287); UNION PACIFIC RAILROAD COMPANY (14-6288); NORFOLK SOUTHERN RAILWAY COMPANY (14-6401),

    *Plaintiffs-Appellants*,

  *v.*

TENNESSEE DEPARTMENT OF REVENUE; RICHARD ROBERTS, Commissioner of Revenue of the State of Tennessee,

    *Defendants-Appellees*.

Nos. 14-6285/ 6287/ 6286/ 6288/ 6401

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
Nos. 3:14-cv-01399; 3:14-cv-01400; 3:14-cv-01401;
3:14-cv-01472; 14-cv-01951—Kevin H. Sharp, District Judge.

Argued:  June 19, 2015

Decided and Filed:  August 28, 2015

Before:  GRIFFIN and DONALD, Circuit Judges; TARNOW, District Judge.[*]

_____

## COUNSEL

**ARGUED:**  James Wiley McBride, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Washington, D.C., for Appellants in 14-6285, 14-6286, 14-6287, and 14-6288.  Everett B. Gibson, BATEMAN GIBSON, LLC, Memphis, Tennessee, for Appellant in 14-6401.  Talmage M. Watts, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.  **ON BRIEF:**  James Wiley McBride, BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Washington, D.C., Brigid Carpenter, BAKER DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Nashville, Tennessee, Stephen D. Goodwin, BAKER, DONELSON, BEARMAN, CALDWELL

_____

[*]The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

& BERKOWITZ, PC, Memphis, Tennessee, for Appellants in 14-6285, 14-6286, 14-6287, and 14-6288. Everett B. Gibson, BATEMAN GIBSON, LLC, Memphis, Tennessee, for Appellant in 14-6401. Talmage M. Watts, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

—————————

**OPINION**

—————————

BERNICE BOUIE DONALD, Circuit Judge. These appeals[1] concern the district court's denial of preliminary-injunctive relief to the Plaintiffs-Appellants, five railroad companies (the "Railroads") who individually brought suit against the Tennessee Department of Revenue and Richard Roberts, Commissioner of Revenue (collectively, the "Defendants" or the "State"), in response to the recently enacted Tennessee Transportation Fuel Equity Act (the "Act"). The Railroads contend the Act violates the federal Railroad Revitalization and Regulatory Reform Act of 1976 (the "4-R Act"), which prohibits states from imposing taxes that "discriminat[e] against a rail carrier." 49 U.S.C. § 11501(b)(4). We AFFIRM in part and REMAND in part.

I.

A.

Congress enacted the 4-R Act in part to "restore the financial stability of the railway system of the United States." 45 U.S.C. § 801. In crafting this legislation, Congress observed that the railroads "'are easy prey for State and local tax assessors' in that they are 'nonvoting, often nonresident, targets for local taxation,' who cannot easily remove themselves from the locality." *W. Air Lines, Inc. v. Bd. of Equalization of S.D.*, 480 U.S. 123, 131 (1987) (quoting S. Rep. No. 91-630, p. 3 (1969)). "Section 306 of the 4-R Act, now codified at 49 U.S.C. § 11501, addresses this concern by prohibiting states (and their subdivisions) from enacting certain taxation schemes that discriminate against railroads." *Dep't of Revenue of Oregon v.*

---

[1]Before us are two appeals in companion cases. The first is an appeal from the district court's decisions denying a preliminary injunction to BNSF and three other railroads (Case Nos. 14-6285, 14-6286, 14-6287, and 14-6288). The second is an appeal from a subsequent decision by the district court denying a preliminary injunction to Norfolk Southern (Case No. 14-6401). On appeal, Norfolk Southern has adopted all substantive arguments made by BNSF *et al.*, and adds discussion of an Iowa case, *Atchison, Topeka and Santa Fe Railway Co. v. Bair*, 338 N.W.2d 338 (Iowa 1983) (en banc). As the issues in the cases are identical, this opinion will address both appeals.

*ACF Indus., Inc.*, 510 U.S. 332, 336 (1994); *see also Burlington N. R.R. Co. v. Okla. Tax Comm'n*, 481 U.S. 454, 457 (1987).  The 4-R Act provides:

> (b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:
>
> (1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.
>
> (2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.
>
> (3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.
>
> (4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.

49 U.S.C. § 11501(b).

Subsections 11501(b)(1)-(3) prohibit "the imposition of higher assessment ratios or tax rates upon rail transportation property than upon 'other commercial and industrial property.'" *ACF Indus.*, 510 U.S. at 337.  The Railroads bring the present case pursuant to subsection (b)(4).  Subsection 11501(b)(4) of the 4-R Act is broader (in that it is not limited to property taxes) and prohibits the imposition of "another tax that discriminates against a rail carrier providing transportation." *Id*.  The Supreme Court has stated that the term "another tax" in § 11501(b)(4) is synonymous with "any other tax." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 284 n.6 (2011) ("*CSX I*").  It is a "catch-all" provision that "encompass[es] any form of tax a State might impose." *Id.* at 285; *see also Burlington N. R.R. Co. v. City of Superior*, 932 F.2d 1185, 1186 (7th Cir. 1991) ("Subsection (b)(4) is a catch-all designed to prevent the state from accomplishing the forbidden end of discriminating against railroads by substituting another type of tax.  It could be an income tax, a gross-receipts tax, a use tax, an occupation tax as in this case—whatever.").  The Supreme Court has further held that the term "discriminates" in subsection (b)(4) carries its ordinary meaning, and that a tax discriminates under this subsection

when it treats "groups [that] are similarly situated" differently without sufficient "justification for the difference in treatment." *CSX I*, 131 S. Ct. at 1109.

The cases at bar began in 2013 with *Illinois Central Railroad Company v. Tennessee Department of Revenue*, 969 F. Supp. 2d 892 (M.D. Tenn. 2013). In that case, the Illinois Central Railroad Company ("ICRR") sued the Tennessee Department of Revenue and its Commissioner under the 4-R Act. ICRR contended that sales and use tax assessments imposed by the State under Tenn. Code Ann. §§ 67-6-502 and 67-6-201(2), respectively, were discriminatory because motor carriers were exempt from the taxes, but rail carriers were not exempt. *See* Tenn. Code Ann. § 67-6-329(a)(2). Following a bench trial, the district court agreed, holding that the State's imposition of the sales and use taxes on the railroad's purchase and use of diesel fuel was discriminatory under § 11501(b)(4) of the 4-R Act. 969 F. Supp. 2d at 901. Accordingly, the district court permanently enjoined the Defendants from imposing the Tennessee Sales and Use Tax on ICRR and other similarly situated railroad companies. The Defendants appealed.

In response to the district court's ruling, on May 14, 2014, the Tennessee General Assembly enacted the statute that is at issue here: the Tennessee Transportation Fuel Equity Act (the "Act"), effective July 1, 2014. Tenn. Laws Pub. Ch. 908 (H.B. 1769), Tenn. Code Ann. § 67-3-1401 *et seq*. The Act essentially repeals the sales and use tax on diesel fuel purchases by railroads that the district court found violative of § 11501(b)(4) in *Illinois Central Railroad*, and now subjects railroads to the same per-gallon diesel tax imposed on motor carriers under the separate Highway User Fuel Tax. *Compare* Tenn. Code Ann. §§ 67-3-1405, -1406 (Transportation Fuel Equity Act), *with* Tenn. Code. Ann. § 67-3-202 *and* Tenn. Code. Ann. § 67-3-1201 *et seq.* (Highway User Fuel Tax). Until the passage of the Act, railroads, like all other carriers using diesel fuel for off-highway purposes, were exempt from a "diesel tax." The Railroads contend the effect of the Act is discriminatory because it now effectively subjects railroads, and railroads alone, to taxation of diesel fuel used for off-highway purposes.

B.

On June 30, 2014, three of the four Railroads party to the consolidated appeal—BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), and ICRR—filed 4-R actions against the Defendants. The fourth party, Union Pacific Railroad Company ("Union Pacific"), filed its 4-R action on October 6, 2014. These cases were assigned to the same district court judge who decided *Illinois Central Railroad*. On July 14, 2014, BNSF moved for a preliminary injunction, seeking to enjoin the Defendants from assessing, levying, or collecting taxes on BNSF's fuel under the Act. After briefing and a hearing, the district court denied BNSF's motion on October 10, 2014. *BNSF Ry. Co. v. Tenn. Dep't of Revenue*, No. 3:14-cv-01399, 2014 WL 5107061, at \*7 (M.D. Tenn. Oct. 10, 2014). CSX, ICRR, and Union Pacific also filed separate motions for a preliminary injunction. The district court denied these motions on October 17, 2014, for the reasons in its denial of preliminary injunction to BNSF.

Likewise, Norfolk Southern Railway Company ("Norfolk Southern"), which is not party to the consolidated appeal, filed suit against the Defendants under the 4-R Act on July 21, 2014. Like the other four Railroads, Norfolk Southern moved for a preliminary junction. The district court denied the motion on October 17, 2014, for the reasons stated in its denial of preliminary injunction to BNSF.[2] These timely consolidated appeals followed.

II.

A.

The parties agree that traditional equitable principles for granting a preliminary injunction do not apply in cases brought under the 4-R Act. Under traditional equitable principles, a court must evaluate four factors when considering a motion for a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the

---

[2]Notwithstanding the denial of the preliminary injunction motions in these cases, the district court granted the Railroads' requests for injunctions pending appeal, pursuant to Federal Rule of Civil Procedure 62(c). These injunctions pending appeal enjoin Defendants from assessing, levying, or collecting the challenged taxes until further order of the district court, and direct the Railroads to pay the disputed tax dollars into escrow accounts. Additionally, the district court has stayed proceedings in several similar cases pending our rulings in this appeal.

injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc) (internal quotation marks omitted).

In contrast, we held in *CSX Transportation, Inc. v. Tennessee State Board of Equalization* ("*CSX-Tennessee*") that a railroad seeking injunctive relief under the 4-R Act need only demonstrate that there is "reasonable cause" to believe a violation of the 4-R Act "has occurred or is about to occur." 964 F.2d 548, 551 (6th Cir. 1992) (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981) (per curiam)). This is because Congress, by enacting the 4-R Act, has already "expressly authorized the granting of injunctive relief to halt or prevent a violation of § [11501]." *Id.* In order for a preliminary injunction to issue, the plaintiff-railroad must demonstrate more than the mere "possibility" of a violation of the 4-R Act. *Id.* at 555. Rather, the plaintiff-railroad company must come forward with sufficient evidence to convince the district court that there is a "reasonable probability" that a violation of the 4-R Act has occurred or is likely to occur. *Id.*

The parties disagree, however, over what standard we apply in reviewing the district court's disposition of the motions for preliminary injunction. Defendants, relying on *CSX-Tennessee*, argue that our review is for an abuse of discretion. *See id.* at 553. The Railroads acknowledge that this is the standard set out in *CSX-Tennessee*. However, the Railroads go on to argue that, because traditional equitable criteria do not apply to cases under § 11501, we must therefore grant less deference to the district court's decision and apply de novo review. In support of this argument, the Railroads cite *Schimmel*, 751 F.3d at 430 (applying de novo review to a district court's determination of whether a movant had a "likelihood of success on the merits" when seeking a preliminary injunction on a constitutional claim), and *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (same).

The Railroads' reliance on these decisions is misplaced. The case at bar presents a statutory claim, not a constitutional one, distinguishing *Schimmel* and *Bays* from our present inquiry. In *Schimmel*, we reviewed de novo one prong of the district court's preliminary injunction inquiry, but only did so because the claims at hand arose from alleged constitutional

violations. 751 F.3d at 430. We explicitly applied the abuse of discretion standard to the lower court's overall determination regarding a preliminary injunction in that case. *Id.* ("We review for abuse of discretion . . . the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief.") (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (internal quotation marks omitted)). Similarly, in *Bays*, we applied de novo review to the denial of a preliminary injunction on the appellants' First Amendment claims. 668 F.3d at 819. But in so doing, we explained that the modified standard of review was applied because the claims at issue implicated constitutional rights. *Id.*

Accordingly, the Railroad's arguments in favor of de novo review are unavailing, and we apply the abuse-of-discretion standard. This standard is deferential, but this Court may reverse the district court if it improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact. *N.A.A.C.P. v. City of Mansfield*, 866 F.2d 162, 166-67 (6th Cir. 1989).

B.

Before we can determine whether the Railroads have established reasonable cause to believe a violation of the 4-R Act has occurred, we must determine the "appropriate comparison class"—that is, we must ask whether the tax imposed upon the Railroads is discriminatory as compared to a tax imposed (or not imposed) upon someone or something else. *CSX I*, 562 U.S. at 299 (Thomas, J., dissenting); *see also Ala. Dep't of Revenue v. CSX Transp., Inc.*, 135 S. Ct. 1136, 1141 (2015) ("*CSX II*"); *CSX I*, 562 U.S. at 286-87 ("'[D]iscriminates' means 'to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit.'") (quoting Webster's Third New International Dictionary 648 (1976)). The first three subsections of § 11501(b) are unambiguous in this regard. Subsections (b)(1), (b)(2), and (b)(3) exclusively concern property, and the appropriate comparison class is "other commercial and industrial property." 49 U.S.C. § 11501(b)(1)-(3). For the catch-all provision of subsection (b)(4), however, Congress did not explicitly provide a comparison class. *See* 49 U.S.C. § 11501(b)(4).

The question of what comparison class to apply under subsection (b)(4) has divided the lower courts. Some courts have applied the narrower "functional approach," under which the comparison class is "other commercial and industrial" taxpayers as established in § 11501's three preceding subsections, which all contain the phrase "commercial and industrial." *See Kan. City S. Ry. Co. v. Koeller*, 653 F.3d 496, 509 (7th Cir. 2011); *Atchison, Topeka & Santa Fe Ry. Co. v. Arizona*, 78 F.3d 438, 441 (9th Cir. 1996); *Kan. City S. Ry. Co. v. McNamara*, 817 F.2d 368, 376 n.15 (5th Cir. 1987); *Ala. Great S. R.R. Co. v. Eagerton*, 541 F. Supp. 1084, 1086 (M.D. Ala. 1982). In other words, courts applying the functional approach have attempted to limit a comparison class under subsection (b)(4) to the same groups identified by subsections (b)(1)-(3).

Other courts have applied a broader "competitive approach," under which the comparison class includes all of a railroad's competitors—a class determined independently from evaluations under subsections (b)(1)-(3). *See Union Pac. R.R. Co. v. Minn. Dep't of Revenue*, 507 F.3d 693, 695 (8th Cir. 2007); *Kan. City S. Ry. Co. v. Bridges*, No. 04-2547, 2007 WL 977552, at *7 (W.D. La. Mar. 30, 2007); *Burlington N. R.R. Co. v. Comm'r of Revenue*, 509 N.W.2d 551, 553 (Minn. 1993).

When the Supreme Court decided *CSX I* in 2011, it declined to resolve the circuit split regarding the appropriate comparison class under subsection (b)(4). 562 U.S. at 284 n.5; *see also id.* at 297, 303 n.3 (Thomas, J., dissenting). On remand, in *CSX II*, the Eleventh Circuit applied the competitive approach. *CSX Transp., Inc. v. Alab. Dep't of Revenue*, 720 F.3d 863, 867, 869 (11th Cir. 2013), *rev'd and remanded*, 135 S. Ct. 1136 (2015). In doing so, the Eleventh Circuit found that the competitive approach best serves the goals of the 4-R Act.[3] *Id.* at 869. The Supreme Court, in granting certiorari in *CSX II*, finally addressed the comparison class question. In its March 4, 2015, decision, the Court held:

> When a railroad alleges that a tax targets it for worse treatment than local businesses, all other commercial and industrial taxpayers are the comparison class. When a railroad alleges that a tax disadvantages it compared to its

---

[3]Moreover, the parties in that case had stipulated that the proper comparison class was CSX's competitors. 720 F.3d at 869.

competitors in the transportation industry, the railroad's competitors in that jurisdiction are the comparison class.

135 S. Ct. at 1141[4]; *see also id.* ("Unlike under subsections (b)(1)-(3), the railroad is not limited to all commercial and industrial taxpayers; all the world, or at least all the world within the taxing jurisdiction, is its comparison-class oyster."). The Supreme Court noted, however, that this seemingly broad interpretation of subsection (b)(4) is limited in a way that subsections (b)(1)-(3) are not: subsection (b)(4) requires a showing of discrimination—"a failure to treat similarly situated persons alike." *Id.* at 1141-42. Accordingly, under subsection (b)(4), "[a] comparison class will . . . support a discrimination claim only if it consists of individuals similarly situated to the claimant." *Id.* at 1142; *see also id.* at 1143 ("[P]icking a class is easy, but it is not easy to establish that the selected class is 'similarly situated' for purposes of discrimination in taxation.").

In essence, in *CSX II*, the Supreme Court approved of *both* the competitive approach and the functional approach. That is to say, the appropriate comparison class varies depending on the theory of discrimination alleged. *Id.* at 1141 ("Subsection (b)(4) contains no such limitation [as in subsections (b)(1)-(3)], leaving the comparison class to be determined as it is normally determined with respect to discrimination claims. And we think that depends on the theory of discrimination alleged in the claim."). Thus, the Court held that the comparison class for a rail carrier's discrimination claim relating to "another tax" under subsection (b)(4) was not limited to commercial and industrial taxpayers identified under subsections (b)(1)-(3), but could also be defined as a rail carrier's competitors.

The *CSX II* Court also determined that "[t]he Eleventh Circuit properly concluded that, in light of CSX Transportation's complaint and the parties' stipulation, a comparison class of competitors consisting of motor carriers and water carriers was appropriate, and differential treatment vis-à-vis that class would constitute discrimination." *Id.* at 1143. Thus, based on CSX's allegations and the stipulation of the parties, the competitive approach was the proper approach *on the facts of that case*. Elsewhere in the opinion, however, the Supreme Court

---

[4]The *CSX II* Court does not use the clarifying terms "competitive" and "functional"—used by the Eleventh Circuit in its opinion—to describe its analysis. We employ these terms in order to simplify the statutory analysis articulated herein.

acknowledged that the functional approach could be appropriate on the facts of a different case. *Id.* at 1141-42 ("While all general and commercial taxpayers is *an* appropriate comparison class, it is not the only one. . . . We need not, and thus do not, express any opinion on what other comparison classes may qualify. Sufficient unto the day is the evil thereof."). We therefore proceed to an examination of the district court's treatment of the Railroads' claims in light of this updated precedent.

C.

The Supreme Court has established a two-step inquiry for evaluating a claim of discrimination under § 11501(b)(4). The plaintiff bears the initial burden of establishing a prima facie case of discriminatory tax treatment. *See CSX I,* 562 U.S. at 288 n.8. If the plaintiff does so, the burden then shifts to the defendant taxing authority to offer a "sufficient justification" for the differential tax treatment. *Id.* If the defendant cannot meet its burden, the tax treatment violates § 11501(b)(4). *Id.*

The Railroads advance three theories under which they contend the Act violates the 4-R Act: (1) the Act "targets" or "singles out" railroads for discriminatory tax treatment because it applies to railroads and railroads only; (2) it discriminates against rail carriers as compared to other commercial and industrial taxpayers (*i.e.*, the functional approach) because railroads would be the only taxpayers who pay a tax on diesel fuel used for transportation other than on the highways; and (3) it discriminates against rail carriers as compared to their principal competitors, motor and water carriers (*i.e.*, the competitive approach) because the Act exempts both motor carriers and water carriers from its reach. The Railroads' allegation of "targeting" or "singling out" is their chief theory of discriminatory tax treatment; they plead theories two and three only in the alternative. The Railroads maintain, however, that they should prevail in obtaining a preliminary injunction under any of these theories, each of which the district court rejected. We address each argument in turn.

1.

The Railroads first assert that a "targeting or singling out claim is sufficient in itself for preliminary injunctive relief." They contend that a successfully pled targeting or singling out

claim obviates the need to determine an appropriate comparison class: "[A] proper 'singling out' or 'targeting' analysis is oblivious to any 'comparison class' since[,] by definition, a 'singling out' or 'targeting' tax is directed only at railroads (and perhaps a handful of other disfavored taxpayers), and not at other commercial and industrial taxpayers generally." The district court implicitly rejected this argument by concluding that "the appropriate comparison class is that of other commercial and industrial taxpayers[,]" thereby adopting the functional approach for its analysis. *BNSF*, 2014 WL 5107061, at *5. The district court correctly determined that this argument does not establish grounds to grant the Railroads a preliminary injunction in this case.

The Railroads' reasoning is circular. Targeting or singling out is not a distinct theory of discrimination. To target or single out is, by definition, to discriminate; in other words, someone or something is "targeted" or "singled out" for disparate treatment as compared to a more favored group or individual. *See* Black's Law Dictionary (10th ed. 2014) (defining "discrimination" as "[d]ifferential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored."). Thus, the Railroads' claim that they have been targeted or singled out for disparate tax treatment necessarily raises the question: relative to whom or what?

The cases the Railroads cite in support of its claim are unavailing. For instance, the Railroads cite the Supreme Court decision in *ACF Industries* for the unremarkable proposition that a state could hypothetically impose an ad valorum property tax that singled out railroads for discriminatory tax treatment. 510 U.S. at 346-47. Setting aside the fact that the Supreme Court's observation is dicta, the Railroads concede that the *property* tax at issue in *ACF Industries*—subject to analysis under subsections (b)(1)-(3), 510 U.S. at 343-48—is unlike "another tax" at issue in cases brought under subsection (b)(4). As previously discussed, the analytical framework that governs subsection (b)(4) is not synonymous with the analytical framework governing subsections (b)(1)-(3) because subsection (b)(4) is not as well-defined as the preceding subsections.

Likewise, the Railroads' citation to the Seventh Circuit's decision in *City of Superior*, 932 F.2d at 1187, is also unpersuasive. In *City of Superior*, the Seventh Circuit enjoined

municipal enactment of a tax on owners and operators of iron ore concentrate docks, which effectively only applied to docks owned by railroads because there were only three such docks in the entire municipality and state, and the same railroad owned all three. *Id.* at 1186-87. In doing so, the Seventh Circuit observed:

> [W]e may assume that a tax is 'discriminatory' within the meaning of the fourth subsection if it imposes a proportionately heavier tax on railroading than on other activities. . . . A tax that, as in this case, is imposed on an activity in which only a railroad or railroads engage—such as placing iron ore concentrates on wharves— is prima facie discriminatory under the suggested test.

*Id.* at 1187. Thus, the tax at issue in *City of Superior* plainly targeted the railroad because it applied to activity in which only the railroad engaged. By comparison, the tax at issue in these cases applies to an activity in which millions of people and entities in Tennessee engage: the consumption of diesel fuel.

Accordingly, the Railroads' arguments notwithstanding, it is still necessary for the panel to determine to which other activities or entities the diesel tax does and does not apply—*i.e*, determine the appropriate comparison class.

2.

As previously discussed, the district court determined that the appropriate comparison class in this case is other commercial and industrial taxpayers. Having adopted this class as its starting point, the district court concluded:

> When using the comparison class of "other commercial and industrial" and considering whether railroads have a heavier tax burden than all other taxpayers in the class, Plaintiff has failed to establish a competitive disadvantage. The Supreme Court has expressly rejected any notion that railroads are entitled under subsection (b)(4) to "most-favored-taxpayer" status. *See CSX [I]*, 131 S. Ct. at 1109, n.8. The idea that the railroads would essentially be free and clear of any state tax on diesel fuel, when all "other commercial and industrial" taxpayers are obligated to pay such tax, would certainly teeter on a "most-favorable-taxpayer" status. Moreover, although other commercial and industrial taxpayers are not subject to this particular Act, Plaintiff has failed to persuade the Court at this juncture that the imposition of the tax discriminates against rail carriers— considering that ultimately all taxpayers pay 17¢ per gallon on diesel fuel consumed in Tennessee. Consequently, based on the evidence in the record at

this stage in the litigation, there is not reasonable cause to believe a violation of the 4–R Act has occurred—and therefore, does not support the imposition of a preliminary injunction.

*BNSF*, 2014 WL 5107061, at *6.

The district court's analysis misses the mark, in part because the district court appears to have reached the merits of the Railroads' claim of discrimination. To the extent the district court's opinion essentially opines on the outcome of the case, its analysis goes too far. At the preliminary-injunction stage, the question is not whether the Railroads may ultimately prevail on their charge of discrimination. Rather, at this juncture, the issue is merely whether the Railroads have shown reasonable cause to believe that subsection (b)(4) has been violated or is about to be violated. *CSX-Tennessee*, 964 F.2d at 551. This standard is not particularly onerous and does not require the Railroads to establish that they are placed at a "competitive disadvantage," as the district court suggested. *BNSF*, 2014 WL 5107061, at *6. Nor does it permit a district court to hypothesize that the Railroads are seeking "most-favored-taxpayer" status by bringing suit under the 4-R Act. Thus, the question of whether the Railroads may ultimately *prevail* on the merits of this theory of discrimination is a question for another day, largely unrelated to the question of whether they have satisfied the reasonable-cause standard for obtaining a preliminary injunction under the 4-R Act.

a.

That is not to say, however, that the Railroads' alternative arguments meet the reasonable-cause standard. The Railroads' second argument is essentially that the Act discriminates against them because it forces them to pay a tax that supports roadways, which they do not use. In support of this claim, the Railroads attempt to characterize the tax as a "user fee" rather than a "use tax." However, a reading of the relevant statutes reveals several flaws in this argument.

The Act imposes a 17¢-per-gallon tax on "commercial carriers [or] persons engaging in the activity of using diesel fuels to transport passengers or goods for a fee." Tenn. Code Ann. § 67-3-1402; *see also id.* at § 67-3-1403(1) (defining "[c]ommercial carrier" as "any individual,

person, entity, or organization that contracts to transport passengers or goods for a fee"). The Act states that "'diesel tax' means 'the tax imposed by § 67-3-202'." Tenn. Code Ann. § 67-3-1403. Section 67-3-202, in turn, defines diesel tax as "*a use tax* of seventeen cents (17¢) per gallon [] imposed upon all diesel fuel and all fuel other than gasoline that is suitable for use in a diesel-powered vehicle or that is used or consumed in this state to produce power for propelling motor vehicles[.]" Tenn. Code Ann. § 67-3-202 (emphasis added). By its express terms, then, the diesel tax at issue here is a use tax and not a user fee. A use tax is "[a] tax imposed on the use of certain goods that are bought outside the taxing authority's jurisdiction" that is "designed to discourage the purchase of products that are not subject to the sales tax." Black's Law Dictionary (10th ed. 2014). A user fee, in contrast, is "[a] charge assessed for the use of a particular item or facility." *Id.*; *see also Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 621 (1981) (noting that "user fees" are "designed and defended as a specific charge imposed by the State for the use of state-owned or state-provided transportation or other facilities and services").

The Railroads argue that they are the only commercial and industrial taxpayer that, under the Act, pays a tax on "diesel fuel which is not used for propelling motor vehicles on the state's highways." Stated differently, the Railroads implicitly contend that the diesel tax is a user fee and not a use tax. But the fact that the Act defines "diesel fuel" in the same way that term is defined in § 67-3-1403 does not mean the diesel tax is intended to be imposed only on diesel fuel used for "propelling motor vehicles on the state's highways." The diesel tax is imposed on any mode of transportation—including railroads—that uses diesel fuel "in a diesel-powered vehicle[.]" Tenn. Code Ann. § 67-3-202. The Railroads also assert that they should not have pay the diesel tax because, they assume, the diesel tax funds the maintenance of Tennessee roads, and railroads do not use or benefit from Tennessee roads. The Railroads have cited no statutory provision mandating that the proceeds of the diesel tax be used exclusively for the maintenance of Tennessee roads. However, even if that were the case (which the State denies), how Tennessee uses the proceeds of its taxation of diesel fuel is irrelevant to the question of whether the Railroads have been discriminated against within the meaning of the 4-R Act. Thus, this argument fails on its face.

This analysis was not the district court's express ground for rejecting this argument. The district court erred in finding that the "[t]he Supreme Court has expressly rejected any notion that railroads are entitled under subsection (b)(4) to 'most-favored-taxpayer' status." *BNSF*, 2014 WL 5107061, at *6. The district court derived this proposition from footnote 8 of the Supreme Court's opinion in *CSX I*. Footnote 8, however, does not disavow the idea that railroads are entitled to "most-favored-taxpayer" status. On the contrary, the majority opinion in *CSX I* expressed no opinion whatsoever as to the status to which railroads are entitled. The majority merely disagreed with Alabama and the dissenting justices' assertions that permitting the railroad in that case to proceed with its challenge to Alabama's sales and use taxes under subsection (b)(4) conferred most-favored status upon the railroad. *See CSX I*, 562 U.S. at 288 n.8. The Supreme Court expressly left unresolved the question of whether the railroad could ultimately prevail on its claim. *Id.* ("Whether the railroad will prevail—that is, whether it can prove the alleged discrimination—depends on whether the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers.").

Based on this footnote, however, the district court in this case concluded that "the idea that the railroads would essentially be free and clear of any state tax on diesel fuel, when all 'other commercial and industrial' taxpayers are obligated to pay such tax, would certainly teeter on a 'most-favorable-taxpayer' status." *BNSF*, 2014 WL 5107061, at *6. This statement misinterpreted the Supreme Court's discussion in *CSX I*. While the district court was correct in denying a preliminary injunction on a functional analysis, it did so on the basis of faulty analysis. However, because the Railroads' claim fails on its face even under the proper analysis, any error the district court committed in this regard was harmless.

b.

With respect to the Railroads' argument under the competitive approach, the Supreme Court decided *CSX II* after the district court issued its decision in the *BNSF* case and after briefing in this appeal was completed. Without the benefit of that decision, the district court found that, because it "ha[d] opted not to use the competitive mode comparison class, it need not conduct an analysis on the exclusion of water ways at this stage in the litigation." *Id.* at *5 n.6.

In light of the fact that the Railroads presented alternative arguments under both the functional and competitive approaches and the *CSX II* Court's holding that both comparison-class approaches may be valid depending on the argument presented by a plaintiff, it is appropriate for the district court to consider this argument's merits on remand.

## III.

Based on the foregoing analysis, we AFFIRM the district court's denial of the Railroads' motion for a preliminary injunction on its targeted or singling-out approach and the functional approach; we REMAND the case to the district court for consideration of the Railroads' argument under the competitive approach.