In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 15-2760

KANSAS CITY SOUTHERN RAILWAY COMPANY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

SNY ISLAND LEVEE DRAINAGE DISTRICT, a political subdivision of the State of Illinois,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 13-3144 — **Richard Mills**, *Judge*.

———————————

ARGUED APRIL 5, 2016 — DECIDED AUGUST 3, 2016

———————————

Before WOOD, *Chief Judge,* and BAUER and WILLIAMS, *Circuit Judges*.

WOOD, *Chief Judge*. The Sny Island Levee Drainage District ("the District" or "Sny") was organized in 1880 in the Circuit Court of Pike County, Illinois, to protect the District from flooding and surface water runoff from the Mississippi River. The Kansas City Southern Railway Company ("KC") and the

Norfolk Southern Railway Company ("Norfolk") both oper-
ate main line railways over the Mississippi River Flood Plain
in the District. The District is permitted under state law to as-
sess properties within its territory in order to maintain the
levees. The Railroads have now sued the District for the sec-
ond time, alleging, as they did in the earlier case, that the Dis-
trict used an assessment calculation formula that discrimi-
nated against them in violation of the Railroad Revitalization
and Regulatory Reform Act (the "4-R Act"), 49 U.S.C. § 11501.
After a 12-day bench trial, the district court found for Sny. Its
finding was supported by the evidence, and so we affirm.

## I

The Illinois Drainage Code allows drainage districts to
levy three different types of taxes on entities within the dis-
trict: "original assessments," "annual maintenance assess-
ments," and "additional assessments." 70 ILCS 605/5-1. Orig-
inal assessments are used for construction of new levees. The
District has had in place an annual maintenance assessment,
authorized by the Pike County Circuit Court, since construc-
tion of its original levees; there are approved periodic in-
creases. The annual assessment has been based on a per-acre
formula since its establishment in 1961; it is adjusted for infla-
tion. Additional assessments are permitted for maintenance
projects that exceed the annual maintenance assessment
budget.

## A

In 2009, facing a budget shortage, the District adopted a
new methodology—not based on acreage—for calculating the
annual assessment to be levied on interstate properties owned
by railroads, pipelines, and utilities. The new methodology

was developed by Sny attorney David Human and Klingner & Associates engineer James Powell. It purported to calculate assessments based on the benefits the District conferred on each property. The Railroads sued over the 2009 change, and the case made its way to this court. We found the annual assessment discriminatory because the District maintained per-acre taxes for most types of property, reserving the benefit basis only for the railroads, pipelines, and utilities. *Kansas City S. Ry. v. Koeller*, 653 F.3d 496 (7th Cir. 2011). The latter group accounted for only 8 out of the 700 properties in the District.

We found Human's and Klingner's numbers, which estimated benefits for the railroads, pipelines, and utilities at $280 per acre, to be unreliable. They assumed property values without any supporting evidence, implemented an unexplained 8% "capitalization rate," made different assumptions about flooding when calculating railroad benefits than pipeline and utility benefits, and ultimately "refined" the numbers when they came out too high. *Id*. at 502.

As a result, we enjoined the District from collecting the annual assessment, which we found to be a tax within the meaning of subsection (b)(4) of the 4-R Act, pursuant to the new formula. 49 U.S.C. § 11501(b)(4). The relevant comparison class, we found, was a "functional" one that included other commercial and industrial properties but not agricultural or residential ones. *Koeller*, 653 F.3d at 509. While we acknowledged that reasonable distinctions between different types of property, such as improved and unimproved land, could support a taxation rate that reflects the difference, we also cautioned that a discriminatory assessment is one that "imposes a proportionately heavier tax on railroading than other activ-

ities." *Id*. at 510–11 (quoting *Burlington N. R. Co. v. City of Superior, Wis.*, 932 F.2d 1185, 1187 (7th Cir. 1991)). The District had not taxed other commercial and industrial properties proportionally to the Railroads. To the contrary, it was charging eight of the other entities in the comparison class nothing and treating six as though they were agricultural properties. We stated, "[i]f … the Drainage Code requires [the commissioners] to assess all property on a 'benefit basis' then [the] entire scheme should reflect that." *Id*. at 512.

Since our July 2011 decision, the District has chosen not to collect annual assessments from the Railroads at all, rather than revert back to collection under the per-acre formula. It has continued to collect its annual assessment from non-railroad and non-interstate properties in the District on a per-acre basis.

B

In 2011, with the 2009 case pending, the District began the process for a one-time additional assessment. The Pike County Circuit Court has the authority to approve, and historically has approved, occasional "additional assessments" in accordance with the Drainage Code, for things such as extra repair work, construction, enlargement or repair of pumping plants, and the payment of legal obligations incurred by the District. 70 ILCS 605/5-1. The circuit court approved an additional assessment of $5,853,162 in December 2011, and asked Sny to file an assessment roll showing how it would be distributed. Sny again relied on Klingner to develop the assessment roll. But this time, the engineers spent a full year calculating the benefit amount for every property in the District. Sny filed an assessment roll based on the new benefit calculations that distributed the assessment according to the benefit

that each property obtained from the existence of the levee and drainage works. After the Railroads and the Illinois Rural Electric Cooperative filed objections, the circuit court denied the Cooperative's objection and approved the assessment roll in July 2013 as to all properties except the Railroads, reserving the question of the Railroads for the federal district court to determine. The roll identified the tax on KC as $91,084.59 if paid in one installment or $103,612.52 if paid in five annual installments, and on Norfolk as $102,976.18 in one installment or $117,139.71 in five.

The federal district court took 12 days to evaluate the competing expert evidence from the Railroads and the District, ultimately finding that the Railroads had not shown that the District's methodology was discriminatory. *Kansas City S. Ry. Co. v. Sny Island Levee Drainage Dist.*, 117 F. Supp. 3d 1036 (C.D. Ill. 2015).

The Klingner engineers used five categories of property for their benefit calculations: agricultural, residential, wetlands/recreational, not-for-profit, and commercial and industrial. The latter included electric utilities, pipelines, railroads, and other commercial structures. They adopted a software program used by the Army Corps of Engineers called the Hydrologic Engineering Center Flood Damage Reduction Analysis (HEC-FDA), which predicts expected annual flood damage to different types of properties. The program uses the "Monte Carlo" simulation, which analyzes water flow throughout a 50-year simulation period, based on historical information, to determine the likelihood that different instances and degrees of flooding will occur. Both the Army Corps and the Federal Emergency Management Agency (FEMA) use the Monte Carlo simulation for estimating flood

damage. Klingner used replacement cost estimates that took into account depreciation for structures that would be damaged in flooding. They used water-surface profiles from a 2004 Army Corps study to estimate flood levels.

Klingner engineers used depth-damage curves, which chart damage in relation to water depth, to predict property damage. For some categories of property, Klingner was able to use published depth-damage curves, including for residential and some types of commercial properties. Its engineers developed their own depth-damage curves for railroads, pipelines, and utilities, even though there are published curves for pipelines, and those curves indicate that floods do not cause pipeline damage. The Klingner engineers knew from personal experience during the 1993 levee breach that flooding does cause pipeline damage. They did not calculate any damage to local and municipal pipelines, however, finding that those pipelines were far enough away from the river that no damage would occur in a breach scenario. Their calculations for agricultural properties focused on crops and did not include structures, based on an assumption (backed by testimony) that structures could be moved before a flood. These three data points were put into the HEC-FDA system to come up with benefit numbers.

Klingner then reduced its original estimates of damage to the Railroads by 75%, explaining that it was being "conservative" with the estimate because of the inherent uncertainties of flood prediction. It maintains that 25% to 30% is the "minimum" amount of damage that would occur to the Railroads from flooding. Sny then assessed each property at 25.3% of its theoretical benefit level by category.

The Railroads' experts chose a different methodology for assessing benefits. They used FEMA's loss estimation software, known as "Hazus-MH," to estimate flood damage for all types of property except the railroads. Hazus-MH estimates loss based on flood depth, property location, property value, property type, and accepted depth-damage curves. The Railroads' experts used county assessor fair-market values for residential and commercial properties, and Hazus-MH defaults for pipelines and utilities. For flood depth, the Railroads' experts employed hydraulic modeling software from the Netherlands Delft Institute of Hydraulics. Because Hazus-MH has no established depth-damage curves for railroads, the Railroads' expert David Brookings walked the length of the railroad and estimated damages using the hydraulic-model estimated flood depths, based on his own experience with water damage to railroad lines.

The Railroads' experts calculated the estimated hypothetical flood damage to District properties from flooding if there were no levees, minus the loss to the properties from flooding with the levees present in the event of levee breach, times the probability of such a breach. (One might say P (NL-WL) = B, where P is the probability of a breach, NL is damage with no levee, WL is damage with a levee, and B is the benefit of having a levee.) This gave them what they considered a net benefit. Ultimately, they came up with *negative* numbers for the Railroads' properties, suggesting that the presence of the levees would actually lead to more damage to the Railroads during a flood than they would experience if there were no levees. This is because, in Brookings's experience, floodwater that rises at the same level on both sides of an embankment (as he said it would from a flood absent any levees) causes

less damage than floodwater rising on one side of an embankment (as it would if there were a levee breach). The Railroads' experts' calculation of hypothetical benefits to agricultural and residential properties contained an assumption that farmers would continue to plant crops each year, even if flooding occurred every year, and that residential property owners would also continue to remain at their homes and rebuild every year.

The district court found problems with the methodology used by the Railroads' experts. Given those problems, and its positive findings about the credibility and reliability of the District's expert witnesses, it ruled that the additional assessment was not discriminatory.

## II

The Railroads raise four arguments on appeal: (1) that the district court did not properly apply the burden-shifting framework from section 11501(b)(4); (2) that the court erred in finding the assessment not discriminatory; (3) that the court erred by admitting testimony from Sny's engineers; and (4) that the court erred by limiting the comparison class to other commercial and industrial properties.

## A

We review *de novo* whether the district court erred in its allocation of the burdens of production and persuasion. *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 361 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 480 (2015). Subsection (b)(4) of the 4-R Act, the catch-all provision, prohibits a state from "[i]mpos[ing] another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction

of the Board under this part." 49 U.S.C. § 11501(b)(4). The Supreme Court has identified a two-step burden-shifting inquiry for determining whether conduct is discriminatory under subsection (b)(4). See *BNSF Ry. Co. v. Tennessee Dep't of Revenue*, 800 F.3d 262, 271 (6th Cir. 2015) (citing *CSX Transp., Inc. v. Alabama Dep't of Revenue*, 562 U.S. 277, 288 n.8 (2011)) ("*CSX I*"). The first step involves the plaintiff's "establishing a *prima facie* case of discriminatory tax treatment." *Id*. The burden then shifts to the defendant to offer a sufficient justification. *Id*.

The Railroads contend that the district court failed to follow the two-step analysis. They are wrong. Because the district court found that the Railroads did not demonstrate a *prima facie* case of discriminatory tax treatment, there was no need to move to step two. Even if the Railroads presented enough evidence to suggest that discrimination was plausible, the district court was entitled to weigh the evidence however it deemed appropriate. This was a suit for an injunction, not a matter that was eligible for a jury trial. Evidence tending to show that discrimination is plausible does not automatically constitute a *prima facie* case of discrimination.

Even if the district court had explicitly considered the evidence of discrimination first, as the Railroads think it should have, and then considered the evidence from the District, the outcome would have been the same. The court found that the assessments were not discriminatory, and it would have found so at the second step of the two-step process even if the Railroads are correct that it failed separately to analyze the first step. The court's findings indicate that had it considered the methodology discriminatory for any reason, it would have found any such discrimination justified by the testimony

and evidence presented that described the Railroads' benefits. We find no error of law.

B

The Railroads also attack the court's conclusion that the assessment was not discriminatory. We review the interpretation of the law *de novo*, but the question whether discrimination exists is a factual one on which our review is for clear error. See, *e.g.*, *Breneisen v. Motorola, Inc.*, 656 F.3d 701, 704 (7th Cir. 2011) (noting that "[a] district court's interpretation of a federal statute such as the FMLA is a question of law which we review *de novo*"); *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 676 (7th Cir. 2014) (factual findings reviewed for clear error). See generally *Pullman-Standard v. Swint*, 456 U.S. 273, 287–88 (1982) (question whether discrimination existed is a pure question of fact subject to clear-error review).

The Railroads would like us to characterize the central question in the case—whether the District's methodology for calculating the benefit to the Railroads and other properties was valid—as a legal one, but it is not. We outlined the relevant legal principles in *Koeller*, 653 F.3d 496, where we held that a per-benefit assessment system is acceptable under the 4-R Act as long as it is proportional and the system for calculating benefits is grounded in evidence. The only debate in the present case is how that rule applies to the new facts.

Where a lower court makes "detailed findings" based on a choice between the testimony of conflicting experts, "[i]f they find support in the evidence we are bound thereby" even if the record would support contrary findings. *Wahl v. Carrier Mfg. Co.*, 358 F.2d 1, 3 (7th Cir. 1966). That rule applies here. The district court had to choose between Sny's experts and the

Railroads', and it found Sny's experts to be more credible and accurate. There is ample support in the record for this finding.

The Railroads would like us to find discrimination inherent in the change from the per-acre to the benefit method and the fact that the Railroads make up 0.3 percent of the land in the district and paid 6 percent of the benefit assessment. At oral argument, counsel for the Railroads stated, "our claim is that we were discriminated against on a per-acre basis." But there is no reason to think that benefits bear a direct relation to acreage, regardless of the use to which the land is put. And we already have held that Sny is not obligated to conduct a per-acre assessment. If the Railroads' only claim of discrimination is that the District assessed properties within its purview on a basis other than acreage, their claim fails. A benefits assessment is discriminatory only if it does not assess all entities in the class in a proportionate manner according to benefit obtained. The Railroads claim that Sny used the same methodology as the one we enjoined from 2009. But Sny presented evidence to the contrary, which the district court credited.

The Railroads next say that the judge erred in accepting Sny's experts, because of five asserted flaws: (1) that the Klingner engineers did not include damages to agricultural structures; (2) that the engineers used original cost of construction as the basis of calculating the value of such structures; (3) that the engineers used recent construction costs instead of original construction costs for the Railroads; (4) that the engineers made "assumptions of catastrophic damages that were unsupported by hydraulic modeling, their personal experience, or information or documentation from the 1993 flood"; and (5) that the engineers calculated projected flood damage to the railroad right-of-way "as a percentage of the

entire length of each rail line in the district instead of specifying locations where damage might be expected." Additionally, they presented evidence that they believe indicated discriminatory intent, including the similarity between the numbers arrived at in this assessment and the 2009 one. These similarities, they say, suggest that the numbers were manipulated to reach a "pre-conceived result." Finally, they complain that Sny treated local and municipal water and sewer facilities differently from interstate pipelines.

The Railroads charge that Klingner improperly alternated between using original cost-to-construct values and adding 30 percent to those values as of the date of a remodel where applicable, and that it used "different years of cost-to-construct data for different categories of property." They complain that the engineers did not sufficiently show how they arrived at their railroad damage estimates, and did not break down unit costs by number of laborers, hours of labor, type of equipment, or milepost locations where work would be performed. And they contend that the 75 percent "discount" and Sny's acknowledgement about the uncertainties inherent in predicting hypothetical flood damage reveal that Sny was working backwards to desired numbers rather than accurately calculating benefits.

Sny responds that (1) Klingner did not include value of agricultural structures because those structures would be removed prior to a flood; (2) it used the original cost of construction because the structures were mostly old and in disrepair, and this number was a reasonable estimate of replacement cost; (3) it used more recent numbers for the Railroads because they undergo constant improvements pursuant to strict

maintenance requirements and federal regulation; (4) the calculated damage was based on reliable software that predicts water events, combined with analysis from the 1993 flood (although it appears that Sny included the estimates from the Norfolk damages but did not weight the fact that the KC line suffered no damages in 1993); and (5) their depth-damage curve for estimating Railroad damages was reasonable.

Sny defends the 30 percent for remodels as necessary to get an accurate estimate of the value of updated structures. Sny notes that it checked the replacement costs against the Railroads' own cost estimates. And it claims that the 75 percent reduction was used to arrive at a "minimum" number. Sny also points out that the district court had many valid reasons for discounting the Railroads' experts, who maintained that the Railroads incurred a negative benefit from the levees.

The district court heard and evaluated all of these points. It concluded that although "there might be other ways of assessing properties that are as good or better," the approach of the District's engineers was "reasonable" and they were "generally credible in discussing [the] process." *Kansas City S. Ry. Co.*, 117 F. Supp. 3d at 1063. The court was "unable to conclude there was any discriminatory impact upon the Railroads ... [t]he District used an appropriate method to determine that the Railroads' assessments reflected a proportionate and just share of the District's levee protection costs." *Id*. We find no clear error in the district court's assessment of this battle of the experts. Its accompanying conclusion that the Railroads had not demonstrated discrimination was therefore also not error.

C

Another arrow in the Railroads' quiver is an attack on the court's decision to admit the testimony of the District's experts in the first place. They contend that it failed to use the correct legal standard in doing so, and thus that the whole case must be re-done. The Railroads claim legal error in the district court's failure to make an explicit statement on each *Daubert* criterion (although more properly they should have paid more attention to Federal Rule of Evidence 702, which superseded *Daubert* many years ago): that the proffered expert testimony (1) be relevant and reliable, (2) be offered by a qualified witness, (3) be based in a scientifically reliable methodology, and (4) assist the trier of fact in understanding the facts in issue. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

But the district court was not required to make these explicit findings before allowing the testimony, and so his failure to do so does not require us to review *de novo* his decision on admissibility. Where a trial judge conducts a bench trial, the judge need not conduct a *Daubert* (or Rule 702) analysis before presentation of the evidence, even though he must determine admissibility at some point. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010). The Railroads moved to exclude the District's expert testimony, and the court entered an order stating that it would defer consideration of admissibility. In the end, it never issued a separate ruling on the motion, but its opinion makes clear that it considered the admissibility of the expert testimony and ruled that it could come in. The district court described all of the witnesses' qualifications in detail, and explained that their methodology was consistent with FEMA and the Army Corps of

Engineers. The district court did not commit legal error, nor did it abuse its discretion, in admitting the testimony of Sny's experts.

D

Last, the Railroads contend that the comparison class against which their assessment should be measured is all other properties in the District, instead of the narrower class of commercial and industrial properties used by the district court. They argue that *Alabama Dep't of Revenue v. CSX Transp., Inc.*, 135 S. Ct. 1136 (2015) ("*CSX II*"), is inconsistent with our 2012 decision in *Koeller*, which held that the appropriate comparison class for the Railroads was other RPU and commercial and industrial properties. In *CSX II*, the Court found that competitors with the plaintiff railroad were the appropriate comparison class for a (b)(4) claim because the comparison class should be "based on the theory of discrimination alleged in the claim." *Id*. at 1138. It also stated that "all general and commercial taxpayers is *an* appropriate comparison class," but "not the only one," and that "all the world, or at least all the world within the taxing jurisdiction, is [a railroad's] comparison-class oyster" under (b)(4). *Id*. at 1141. The Court clarified that the "similarly situated" requirement is not as narrow in the 4-R Act as for tax claims under the Equal Protection Clause. *Id*. at 1142. And the Court noted that railroads cannot easily "hand-pick" their comparison class based on *CSX II*, because "it is not easy to establish that the selected class is 'similarly situated' for purposes of discrimination in taxation." *Id*. at 1143.

We read *CSX II* as emphasizing the importance of the "similarly situated" requirement for subsection (b)(4) claims; so understood, it is consistent with our "functional approach"

in *Koeller*. Although *Koeller*'s holding is no longer sound to the extent that it rejects all universal classes, the appropriate class for the Railroads' claim here is one that includes only other "similarly situated" entities: the railroads, pipeline, and utilities, plus commercial and industrial properties, excluding agricultural properties. *CSX II* does not allow the Railroads to define their class as "all taxpayers in the district" simply by alleging that they were discriminated against as compared to all taxpayers in the district.

The Railroads argue that because Sny takes the position that it has assessed all types of property on the same basis, all types of property are therefore similarly situated. But that renders the "similarly situated" language meaningless: by that logic, the class would always be all taxpayers, not similarly situated taxpayers.

The Railroads conceded at oral argument that they cannot prove their discrimination claim other than by referring to a universal class. Even that would not help them on this record. The district court found, as a matter of fact, that the calculation of benefits to all types of properties was appropriate and acceptable. We find no clear error in that assessment, and thus no violation of the 4-R Act.

## III

Because the Railroads have not identified any legal error, abuse of discretion, or clearly erroneous factual finding on the part of the district court, that court's judgment is AFFIRMED.